# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF GEORGIA
GAINESVILLE DIVISION

ROMULUS J. AVOLIO, )
)
Plaintiff, )
)
v. )
) 2:24-CV-00296-SCJ-AWH
CGL COMPANIES, )
)
Defendant. )

---

The DEPOSITION of:
Romulus J. Avolio
Being taken pursuant to stipulations herein:
Commencing at 10:00 a.m.
Tuesday, October 14, 2025
Before Kathryn Taylor, CCR

All parties, including the court reporter, appeared by videoconference.

Job No. 7657935

A P P E A R A N C E S

ATTORNEYS FOR DEFENDANT CGL COMPANIES:
Reginald F. Lys, Esquire
Laura Balson, Esquire
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
230 Peachtree Street, Northwest
Suite 2400
Atlanta, Georgia 30303
(404) 525-8622
rlys@constangy.com
lbalson@constangy.com

I N D E X


| | |
|---|---|
| DEPONENT | PAGE |
| ROMULUS J. AVOLIO | |
| Examination by MR. LYS . . . . . . . . . . . . . . | 5 |


* * *

A T T A C H M E N T S


Certificate

Reporter's Disclosure Statement


* * *

T R A N S C R I P T C O D E S:

| | |
|---|---|
| -- | interruption/change in thought |
| . . . | incomplete thought |
| [sic] | denotes word/phrase that may seem strange or incorrect has been written verbatim |
| (ph) | phonetically spelled |
| (indiscernible) | not capable of being understood |

I N D E X  TO  E X H I B I T S


| EXHIBITS | DESCRIPTION | PAGE |
| --- | --- | --- |
| DEFENDANTS' | | |
| Exhibit No. 1 | Employee Correction Action | 37 |
| Exhibit No. 2 | August E-mail | 45 |
| Exhibit No. 3 | E-mail | 52 |
| Exhibit No. 4 | Attachment to E-mail | 53 |
| Exhibit No. 5 | E-mails | 55 |
| Exhibit No. 6 | E-mails | 57 |


(Exhibits attached to original and all copies produced.)

P R O C E E D I N G S

10:00 a.m.

(Whereupon, the court reporter complied with the requirements of O.C.G.A. Section 9-11-28(d).)

(Witness sworn.)

Whereupon,

ROMULUS J. AVOLIO,

was called as a witness herein and, having first been duly sworn, was deposed, and testified as follows:

EXAMINATION

BY MR. LYS:

Q. Mr. Avolio, can you please state your full name for the record?
A. Romulus Avolio.
Q. And have you ever done a deposition before?
A. I -- I don't think I have.
Q. Okay.
A. I don't know. I don't think I have.
Q. All right. No problem. So I'm going to go over like just a couple of rules for depositions because they do differ a little bit than regular conversations, and particularly with this one, since we are on Zoom, some of those rules are a little bit more important than normal.

And so I'm just going to go over that now. I

guess the first thing is because it's a deposition that's being transcribed by the court reporter, we need to have oral answers to questions. So I know in normal conversation if I ask you a question and you nod, obviously I understand what you're saying, but the court reporter can't transcribe a nod.

A. Yes.

Q. So we need a verbal yes or no to the questions I ask. And also because --

A. Okay.

Q. -- this deposition is being transcribed and it's easy for the reporter to understand what my questions are and what your answers are. I just ask that when I'm asking a question, you just wait until I'm done to answer, and I will give you the same courtesy of waiting until you answer -- finish answering a question before I respond with another question.

Also, if you don't understand a question that I have asked you, don't hesitate to ask me to clarify or restate the question. If you don't say so, I'm just going to assume that you understood the question. And because the deposition is being taken under oath, you know, we want, you know, to make sure that you understand the question so that you know that you are

giving the most truthful response.
A. Okay.
Q. If you need any breaks during the deposition, don't hesitate to ask for any. I just ask that before you ask for a break, you just finish answering the question that I've asked you. Say, like, Hey, can we take a break here for a couple of minutes?
A. Okay.
Q. And we will just go off the record and we will set a certain amount of time for the break and just come back.
A. Okay.
Q. And also, this deposition is like -- I don't need you to make up any answers. I understand that some of this stuff is, you know, it's in the past, it was a couple of years ago, so if you don't remember anything, it's okay to say that you don't remember. If you don't know anything, it's fine to say that you don't know.
I'm not looking to, you know, make up anything here. And then I guess with that, you know, we can just start off the deposition. We will just go into a little bit of your background and then get into your time at -- working for CGL.
So can you give me your date of birth?

A. 05/03/85.
Q. And where were you born?
A. Romania.
Q. Nice. When did you move over to the States?
A. I don't know. I think I was adopted when I was six years old. I mean, the '90s, I don't know.
Q. And then where did you -- when you were adopted, where did you start -- where did you live in the States?
A. We lived in Ohio.
Q. And how long did you live there?
A. Until 2002 to -- 2002 -- 2002 summer, I believe.
Q. Did you go to school out there?
A. Yeah, I did. Up until I -- actually junior, I think, and then I came here and did -- no, sophomore. Sophomore and freshman up there, and I came down here and did my junior and senior.
Q. And when you say you came down here, where are you referring to? Atlanta, Georgia?
A. We moved to Forsyth County.
Q. Forsyth County?
A. Yeah.
Q. And what town were you living in in Forsyth County?

A. What is it? Forsyth/Suwannee area in Forsyth County.
Q. Did you go to high school in Forsyth County?
A. I did, South Forsyth.
Q. Did you go to college or any type of secondary schooling?
A. No, just a little bit of trade school and that's it, Lanier Tech.
Q. Yeah. What did you study in trade school?
A. Construction management, plumbing, and I think I did one semester of -- what is it -- oh, criminal justice, and that's it.
Q. How long did you go to trade school for?
A. I think plumbing was like a -- I don't know how long. A year, two years, I don't know.
Q. And then after trade school, did you start working?
A. I worked during -- during school, yes.
Q. What was your first job?
A. Construction, carpenter.
Q. And who did you work for?
A. Shoot, Larry. Larry or something. I don't know. Larry Construction. I don't know what it is. I don't know. Some kind of construction. I did that for about six months until I had a car accident, and then I

worked for the school system as a custodian for the next three years after that.

Q. So when you say you worked for that construction company for six months, what year was that when you were working for that construction company?

A. Oh, your guess is as good as mine. I would say 2004 to 2005, think. So it's like I graduated in 2004, so . . .

Q. And then after that, you said you started working for the school system; is that correct?

A. I did, yes.

Q. And then what did you do for the school system again?

A. I was a custodian.

Q. Custodian. And how long did you work for the school system?

A. I would say three years. Three-plus years. I don't know exactly how much, but . . .

Q. And then was that the Forsyth County School System?

A. Oh, yeah. That was Forsyth County Schools. Yes, that was Forsyth County.

Q. Forsyth County, all right. Then after that, what did you do for work?

A. I really don't know, to be honest. I can

pull up my resume and look at it. I know -- I know I -- I don't know what I did, actually. I think afterwards I took care of some elderly folks for about ten years, and I also worked at a hospital. I did security. And did a little bit of security work for a couple of security companies.

Q. And what security companies were those?

A. Boy, your guess is better than mine. I mean -- I mean, throw a dart at a whole bunch of names and figure it out. I don't know.

Q. How long did you do security work for?

A. I'm going to say three years. I have no idea. Could be longer. I don't know.

Q. Okay. No problem. And after you did your security work, what did you do?

A. I know in 2010, I took care of -- I moved in with an elderly couple and became a live-in caregiver, and then I also -- while I was doing that, I also worked for AMR as a medical transporter within the hospital, but I can't tell you how long the durations were. I mean, I know Luke and Louise and that caregiving job took at least 2010 until about three years ago when she -- when she passed.

But it wasn't -- but I guess it wasn't -- it wasn't really a job because I didn't get really paid

for it, so I guess, technically, that wasn't a job. I just had free room and board.

Q. Okay. And then you said while you were doing that, you were working as a AMR -- what was that? A transporter?

A. AMR, yeah. I think it's AMR, yeah, American Medical Response transporter within the hospital, at Fulton Hospital on Highway 9 in -- in Alpharetta, Georgia. So that one, I just transferred patients to and from CTs, procedures, swallow test studies that they were -- anything that needed done to be transported, I was the one that took them to and from.

Q. So after you -- after your caregiver work and your transporter work, what did you do for work after that?

A. I think I worked at the hotel. I worked at the hotel for about -- I can't tell you how long. It could be three to four years on that one, four or five. I don't know. As a maintenance engineer at the hotel in Cumming, Georgia.

Q. What did you do as a maintenance engineer for the hotel?

A. I did everything from construction management to -- yeah, I mean, to -- to schedule repairs that was up over my head, mostly air-conditioning repairs and

oversaw the construction teams as they were going through the renovations of the hotel. And I did anything -- mostly maintenance routine, on-call stuff, and if the people trashed the rooms, I would go over there and fix the hall and get it painted within an eight-hour window, and I was legit, I guess.

Q. What hotel was that again?

A. I was legit. I took care of the place for five years. I think it was five years I did that.

Q. No, no. What was the name of the hotel again?

A. Oh, Holiday Inn. Holiday Inn Express, I think. It's over there in Cumming, Georgia off of 400, Exit 14.

Q. You said that's in Cumming, Georgia?

A. Yeah, Cumming, Georgia.

Q. And I know you said this, but how long did you work for Holiday Inn?

A. I know it was more than three years. It could've been four or five years. I really don't know. I suck at numbers. I suck at dates, but it will come to me after we -- after we -- down the road, I guess it will come to me.

Q. Okay. And then after you worked for the Holiday Inn, what was your next job?

A. I think I also worked at Even Hotel over there in Alpharetta.
Q. What did you do for them?
A. Same thing. Maintenance -- maintenance engineer. That was during the day shift. Everything from maintaining any issues to whatever. I mean, I don't know, properly cleaning of the machinery and stuff like that, like the ice machine and maintenance. So it was a very new hotel, so . . .
Q. How long did you work for Even?
A. I don't know. It could have been a year. I really don't know.
Q. After your position at Even Hotel, who did you move on to? Who did you work for after that?
A. I think I worked for CGL.
Q. CGL. So when did you start working for CGL?
A. Oh, I have no idea.
Q. What is your best guess?
A. I -- what year is it? 2005? I think 2003/2004. I suck at dates. I will tell you that. I suck at dates, I suck at details, so . . .
Q. It's 2025. Do you mean 2023?
A. Could be 2023 -- yeah, 2023. It could be in October, actually. It could be in November.
Q. Before working for CGL, did you ever like own

your own business or anything like that?

A. Like, it was legit? No. I said -- see -- I may have had a landscaping company, but everything was cash if I did. But I don't remember owning nothing besides -- I don't think I did. I did -- I did stuff on the side, but it was never a business.

Oh, I think there was a Chic Haulers, which was -- Tom and I created that, but I don't think my name was on it at all because I didn't have any signed papers. I think that was Mr. Tom. I just worked for him, I guess. No, I don't think I did. I could have, but I don't know.

Q. What work did you do for -- you called it Chic Haulers; is that what you said?

A. Yeah. It was a -- it was a -- it was a moving company/removing. So he was an estate sale guy, and what I -- what I did, is I came in after the estate sales and I cleared out -- I would clear out the facility. I cleared out the house, basically, for the -- because usually you do have estate sales after someone dies and before they sell the house or right after they sell the house, so I would go there and remove all the -- all the unsold mentioned items, I guess you want to call it.

So I just got rid of them, just most of them.

But I don't think -- I don't think I actually owned a real business. My name has never been on a real business. If it has, then you found something I don't know.

Q. Do you ever do just like side jobs for people? Maybe not like an official business, but . . .

A. Oh, side -- yeah, yeah. I'm always -- I was always side hustling.

Q. And what type of work did you do for your side jobs?

A. When I was taking care of Luke and Louise, I had another gentleman I always -- I always took care of. I checked up on him. He had neuropathy, so I took care of him a lot. Every morning, I would go feed him breakfast, give him a shower, take him shopping, and then every night, we'd go out to dinner.

And then, of course, I did the irrigation side hustle where people would pay me to go irrigate -- irrigate their yard, did a little bit of landscaping. Anything to make -- anything to make a little bit of money, you know.

So -- and, of course, plumbing, because my plumbing skills are pretty good. And mostly carpentry because -- oh, I went to school for carpentry. I meant to tell you that. I went to a woodworking academy up

in Ohio, so . . .
Q. Was this when you were --
A. This was when I was 15, yeah. That was when I was up in Ohio when I was -- in the early 2000s, I went to Cleveland Woodworking Academy.
Q. Did you do any other trade schooling?
A. Well, I -- I mean, like I said, if I remember throughout this -- throughout this deposition, I will be glad to tell you because I -- obviously, I forgot that one, so . . .
Q. And then when you started for CGL, what was your position?
A. General maintenance.
Q. And what did your duties entail?
A. That would be, I was the support guy for the other trades, for the electrician, HVAC, the -- the security, the safety/security guy. But mostly mine was taking care of simple tickets from -- they needed something hanging, something hanging on the wall, drywall, replace broken ceiling tiles. If there's any water damage, the plumber would get there first, and then I'd come behind him and fix the -- patch up the walls.
Like I said, every -- every -- I had my own tickets. I mean, whenever our assistant that answered

the phone, she would -- she would divvy up the tickets to the right person, and I would just show up and do my tickets. And then, of course, I would help my other co-workers. And that's it, basically.

Q. So did your work include like indoor plumbing and things like that?

A. Oh, yeah, yeah. No, no, no, I did. Yeah, yeah, of course, yeah. Yeah, yeah. If anybody was out, I was covering their shift. I was covering -- so if the plumber -- which the plumber was out a lot. I became the plumber for my day, and we'd have to choose which one was more important then. Because, you know, I could still do my job, plus his job, so I was having to pick the most important plumbing tickets and take care of that.

Like swapping out a day sink, a hot water supply faucet for a day sink is not that important compared to 12 toilets backed up. So therefore, I had to do that. I also did basic electric. He had me troubleshooting and stuff like that. And like I said, I also helped out the safety guy, which was Derek. I helped him with his door inspections and door maintenance, I did gate maintenance. There's a lot of things I did, if that makes sense, so I don't know how to explain it to you. I could spend all day telling

you what I did, but . . .
Q. That's fine.
A. (A technical interruption.)
Q. Sorry, Mr. Avolio, you froze on my end.
A. Hold on. Can you hear me now? Hold on. I don't know what happened there, but . . .
Q. Yeah. You're back for me.
A. Okay.
Q. Did you typically work your shifts -- I guess who worked with you on your shift? Were you the only maintenance -- were you the only general technician working?
A. I was the only -- I was the only general technician, yes. Yes, because we had Derek, which was life safety. We had the HVAC guy. I forgot his name. Scott, I think. And then we had Lance, the plumber, and I was the plumber there for a while. And then we had Danny, which is the electrician. So, yeah, we only had one of each. One of each, so . . .
Q. And then when you worked a shift and the plumber was working a shift, you wouldn't have handled it, but you would do the plumbing work if like the plumber was out or . . .
A. I was -- I was as important for everybody, if that makes sense. So if Derek said, Hey, I have -- I

have to do these doors, could you please -- but I'd have to babysit fire inspection guys. I said, Okay. So I will go do the doors, or even then, I would either -- I would mostly participate with babysitting contractors because we had a lot of contractors, and we would have to babysit them. And I was the lowest paid on the totem pole, so they are going to tie -- they're not going to tie up an electrician that makes a hell of a lot more money on -- on babysitting, so they put me on babysitting duty.

So I was also babysitting contractors. But if there was no contractors, I was doing my own tickets, and completing -- completing them and updating the ticket status, and I was also helping my coworkers on their projects.

Q. What do you mean by "babysitting contractors"?

A. Well, we -- we can't let contractors work within the facilities -- within the facility buildings by themselves. They have to be -- someone would have to babysit. Even though I knew somewhat what they were working on, I would still have to sit there and watch what was going on to make sure they're not doing anything stupid and make sure they don't wander off the jobsite, make sure they stay in a designated area.

Q. Okay. So --
A. We worked within the prison and we worked within the courts -- the -- the holding cells area within the -- in the courtroom area. So we had to make sure. We weren't security, but we were just making sure they were contained.
Q. So was there a security requirement from Forsyth County that they couldn't be on-site without any --
A. Yes, yes. I guess -- guess that's when their protocol. I don't know if I was told, but, yeah, we can't let a contractor just have free range at the building. We always -- we always had them accompanied by us. I don't care if it was just to check the -- I don't care if it was just in the lobby, we still had to accompany them.
Q. Who would assign you to watch the contractors when they came in?
A. Who? Usually, it was Derek. Like, Derek had elevator inspections consistently. He also had a whole bunch of building inspections, and I would -- he would tell me or we would talk in general, Hey, what's going on? I said, Oh, I will watch them if they want to, and he would say yes or no.
Like, Danny -- like, sometimes like the

generator -- Danny would have to do the generators because he knows what he's doing, and so he would hang out with them.

But a lot of times everybody knew that I was willing to step in for a lunch break or if -- you know what I mean? Like, I don't know how to explain it to you, but it was really -- I mean, like I said, I was the go-to person there, so . . .

Q. So if a contractor came in and let's say they were there for something that Derek was assigned to -- some type of work that Derek was assigned to, would Derek assign you to watch the contractor while he handles his other duties or --

A. Derek -- yeah. Derek would get them started, and like sometimes he would -- I would say, Do you need help? He said, You know what, okay. And he would ask me to come, and I would go take care of him, and he would either come after lunch or just shortly after he had lunch. But there was no -- there was no set rule.

But -- but whenever Josh came into play, it was mostly, Let's put the lowest guy on the totem pole to babysit him. It was like his -- it was like -- here's an example, they -- they -- we ended up doing something -- we ended up having a 911 -- an emergency 911 center installed within the jail. That's an

electrician.
So the electrician would get him started or else he would come in late. Like, he would come in at a later time, the electrician, so I would get there at my time and I would take them up there and walk them back and forth to get their tools. And then Danny would come and make sure everything is okay, and then if he had other -- other details -- other work to do, then he would call me or we would talk to the supervisor or whatever, and I would end up staying with them a lot. So I, quotations, babysat a lot of the contractors, so . . .
Q. And then -- so when you were babysitting the contractors, as you put it, in and around the facility, did you need to get keys from the facility to access certain portions of the facility or . . .
A. Sometimes, yes.
Q. What was the procedure for getting the -- sorry, forgetting the keys for the facility?
A. Well, usually, if it's like life safety, like they have to work on the fire system, and they have to go in the panel inside the control room, I would literally just say, Okay, we will get buzzed in. And they'll say, Hey, by the way, since I'm here, can I have a set of keys?

And they'll either just give me my -- they'll either ask me for my four-digit PIN or they would use their own four-digit PIN and give me a set of keys. And then once they are done putting the system in standby, then I would go -- then we would go escort them wherever they needed to go, but . . .

Q. When you say "they would buzz me in," who are you referring to?

A. Console security.

Q. Console security? And that is like a --

A. The sheriff's office, yeah. Yeah, that's the brains of the operation, I guess, for the jail.

Q. What's the room that they were buzzing you into to get keys?

A. The control room. It has a double secured door.

Q. And is that control room on the, I guess, campus? Is that how you would put it?

A. Yeah, yeah. You could access it through the jail building either from the jail side or else from the administration side.

Q. And then you said that that was the procedure for --

A. It wasn't the procedure. It's just what we ended up doing because -- because why -- why -- if they

have to go in the -- if they would have to go in the room to deactivate the -- put those life safety -- put the alarm on standby, why am I going to drag them around -- around the corner to get the keys, when I can just eliminate that and go straight to the control panel -- the control room? And I said, Hey, can I have a set of keys? They either say yes or they say no.

If they say no, then I'd go back, after we're done -- after we're done putting the system on standby, go out, enter my four-digit PIN, and then they'd have to get up and give me the keys. So it's -- it's -- at the end of the day, it's a discretion of -- of the staff that's actually in that, in that control room.

Yes, I mean, a lot of people, I guess -- I see my colleagues -- I see my colleagues go to the window and then come in. I've seen them go in the room and then get the keys from there. Like, I know for a fact, Derek would have done it a couple times, but I can't really -- but if we were in that room, it had to be -- had a reason to be in that control room. It would not hurt to ask, Hey, can we have a set of keys?

And a lot of times they would either say yes or no. And there's plenty of times where they said no, and I would have to take -- take my contractors out or -- and go around 30 feet through two double doors,

and then just enter the key, and that's it. It's like -- it was like second nature. It's like you brush your teeth. It's just -- you know what I mean?

Q. And then you mentioned that sometimes some of your colleagues would go through the window. I'm not familiar with the facility, so, you know, if --

A. Yeah. There's a secure -- there's an -- there's an access window that has a four-digit PIN that activates the key box, which is in return operated -- or the control officer has to get up from what he's doing to actually go get the key out. And sometimes if he didn't -- if he waited too long, it would time itself out and we would have to push -- we would have to re-enter the four-digit PIN, and we would tell them what key we wanted. If you want a maintenance key, then he would give us -- we had a list of a set of keys we were authorized to take.

Q. And then you stated this is what you did for like -- was there a different -- well, did you do something different if the keys were for a different portion of the jail?

A. Anytime I needed keys from the jail, I either went to the box or I went from the -- or went to the window, accessed it, or else I would -- or else they would buzz me. If they buzzed me in, I would say, Hey,

guys, how are you doing? Just came to get a set of keys.

And if they gave me the keys, then they gave me the keys. If they told me, Can you go around -- sometimes they were training, and they would say, Can you just go to the window? Because they want to teach -- I don't know why. I was told whatever they say, you go with it. And -- but if you go to the courthouse -- you go to the courthouse, you actually physically got to get buzzed into the -- into their command room in the courthouse and you just enter your own four-digit PIN with your thumbprint right there at the key box. So it's -- I guess it's two different -- two different -- two different ways you do it. One at the courthouse, and the other one at the jail.

There's two different ways, but I mean, some -- I know sometimes when I went to the courthouse, I'd ask her for a set of keys, and she would say, Sure, or else she would have me buzz me through, or I would just come around the side and get my own keys with my thumbprint. Because they want to -- the -- the whole reason is -- for the four-digit PIN is for, I guess, knowing where the keys are at all times and who has them last.

Q. So the keys for the courthouse and the keys

for the jail, they weren't in the same room?
A. No, totally different buildings.
Q. Totally different buildings?
A. Yes.
Q. The keys for the courthouse were in a room you called the command center; is that correct?
A. A control room. Yeah, I guess, yes.
Q. And then where were the keys for the jail again? Sorry.
A. The jail was that control room too. Where they have a console security officer that looks at all -- that takes the phone calls and has like hundreds of monitors. He's -- you know what I mean, so . . .
Q. Were you aware of how Forsyth County deputies like track who had the keys?
A. Oh, yeah. That's why you use a four-digit PIN. And then -- and then each -- before each shift, they -- the console security will actually get a list of what keys are missing, and then they have to go hunt them down. There's plenty of times where -- where at least three times I've actually left the property with the keys, and I got a phone call, and I would turn around within a block away and give them my key -- give them my keys. And then I would meet an officer and staff member in the lobby and they would take my keys

or else I would have to actually get screened in and go to a console security after getting screened in and physically put my keys back or physically enter my four-digit PIN.

So there was multiple different ways to do it. Sometimes they -- I know a lot of times it was after hours because there's -- when I say -- if it's shift change, they would meet me at the actual lobby to grab the keys because they want to get out of there and screening me in is a pain in the butt sometimes. It's not as convenient for them.

What am I going to tell them? No? I mean, I can tell them, Hey, I have to put -- no, dude, they have authority. We work for them. So if they want the keys, here you go. I know it's on camera, and see you later.

Q. And so I missed this earlier, what shift did you normally work?

A. Morning shift, first shift.

Q. And what was --

A. 8:00 till 5:00.

Q. 8:00 to 5:00

A. Yeah.

Q. And so before you left your shift at 5:00, you had to return the keys?

A. Oh, yeah. We all have to -- yeah. We try to return them. Yeah, yeah, because my office was at the courthouse, and I would go right by that office -- right by the console -- the jail console security office. So I would try to drop my keys off on the way to my office to do my paperwork, which was like an hour and a half before because we give ourselves an hour to do paperwork.
Q. And then you said sometimes, you know, if an employee like left with the keys, you would just be called and asked to return the keys if --
A. Yeah, yeah, yeah. No, we had to return them. It's no if, ands, or butts. I know plenty of times Derek told me he had to come back. I know Danny told me. I know Scott told me. Everybody has told me ugly stories, and these people live way further than I do, and they would have to get home and they have to turn around and bring the keys back, so . . .
Q. Did anyone ever get in trouble for having to come back with the keys?
A. No, no. I think Scott -- not Scott, I'm sorry. I think Josh would say, Hey -- Josh would call you right then and there and say, Hey, you left the keys again or -- you know what I mean? So he would just talk to us like, Hey, you can't do that. Like,

you know I mean?

Like, it looks bad on us, and I guess I don't believe anybody got in trouble. I know -- I know when Derek left the keys, he told me -- because I freaked out when I lost them, when I -- when I misplaced the keys. And he says, What's the big deal? No big deal. I left my keys in my office, and they ended up calling me, and I walked the officer down to my office and walked him through where to find them.

And he didn't get a slap on -- he probably -- he -- he said he did not get reprimanded for it, so . . .

Q. Got it. And then you said it was three times when -- at least three times when you had a --

A. Your guess is better than mine. I know it's a handful of times, but every time I would figure it out, I'm like literally less -- one time, I went all the way -- all the way up 141, and then I had to come right back, but, I guess -- it's the nature of the beast, I guess.

Q. Was there any other time when you didn't know where the key were placed at?

A. Besides that time supposedly I lost the keys before I got -- a couple weeks before I got fired? I think there was another time, but I -- but it was

just -- it was like, Oh, yeah, here it is. And I either secured it in my -- because we can't leave the property with the -- with the keys, so we would either lock them up in our toolbox or lock them up in our desk. And I think that's what it was. I did spend a minute looking for them because I remembered (technical interruption).

THE COURT REPORTER: He's freezing up.

BY MR. LYS: (Resuming)

Q. Mr. Avolio, could you repeat yourself for us? You just froze up for us, unfortunately, so I'm sorry. If you could just repeat your answer.

A. I said there's probably one time I probably did leave my keys either in my desk drawer or in my toolbox and I went off to lunch and I came back and then somebody reminded me about my keys. And I said, I don't have them, and then I had to sit there and think about it because -- and then I realized that I had either left them in my desk, locked, secured desk, or my secured toolbox. That's the only time.

Q. So if you were to leave the property for lunch, you had to return your keys too, or is that --

A. You would have to return the keys or secure them -- secure them in your toolbox or secure them in your office.

Q. Got it.
A. That -- that -- that -- I don't know if that's what you're supposed to do, but that's the general practice we all practice.
Q. Okay.
A. So -- and things happen. People do take keys off. Like, I did it. I did it on the way home, and it's such a pain in the butt, but at the same time, it's the nature of the beast, if that makes sense.
Q. Okay. So do you -- was there a protocol for or -- strike that.
What did you guys normally do regarding like your use of tools in the jail?
A. You mean like signing them out?
Q. Yeah. Well, I don't know. Did you have to sign --
A. Yeah. No, no, no. I mean, we have our own tools. We have our own tools in our own toolboxes with wheels, and we have shadow boxes, and we have to keep them locked at all times. And -- and then if we needed anything like the snake -- like the plumbing snake or we needed like the saw or anything that, tools that we don't use on a normal basis, we had the shadow board, and any time we needed tools, we have to go there and sign them out.

So you have to get the paper, you saw your name, put the item number, where it's located, which is shadow board one or shadow board two or against the back wall. You put a time out, signing time out, and then when you bring it back in, you sign it back in.

A. But --

Q. And -- I didn't mean to cut you off.

A. But the one over there in the -- in -- but the one over there in the -- in the courthouse, there wasn't a sign-out sheet there. We didn't really -- I mean, we just took it and returned it if we needed it. When I say "took it," I'm talking about like -- like if I was working in the shop, like if I had to use a -- the vice or something like that and I needed a tool, I went through the gate, took it, and put it back.

But if you go to -- if you go to the Annex building, there is a clipboard with the toolbox with the keys and you'd have to -- same thing, you'd have to sign out the -- acknowledge that you took the tool back, you took the tool out, and you -- and you signed it back in.

Q. Got it. Did you ever have an incident when you lost a tool?

A. I don't remember -- well, I mean, I don't know if I ever lost a tool or not. I know I lost some

parts. I misplaced some parts. But at the same time -- but at the same time, like Josh did tell me that it's my word against their word, but I did admit I did lose some plumbing parts. We never found it, we don't know where it's at. We don't know if I took it off-site, we don't know where it's at.

And then since then -- since then, we came -- since then, they came with the new -- we came up with a new -- new protocol when it comes to parts in our own carts -- in our own toolboxes. So when they came with a new protocol, everything seemed to be okay because we never inventoried the parts that we had inside the -- inside the toolboxes. We only inventoried the tools that we would use, like the pliers, the -- the -- you know what I mean? The drill bits.

But when it comes to the screws, we never counted, Hey, we have five screws in container one or container five. And then since that incident happened in December, I think, that -- that supposedly I did lose or misplace -- because we don't even -- they have yet to be found because it could be something I could have taken home because it's a small box. I mean, it could have been -- so Josh doesn't even know if it's even -- if I even actually lost it.

He thinks -- he thinks I may have thought I

lost it, but once again, I did get -- we did have a conversation about that. But -- and because of that, we did come up with a better -- better accountability for when it comes to the tools and the actual -- the actual parts and screws, nuts, bolts, and any small miscellaneous items are always accounted for.

Q. Do you remember when that situation occurred?

A. It could have been November or December. I know it was right after I got diagnosed, and I was working on [sic] Josh with my ADD medicine and I was also training the new guy, the new plumber. So I know it was around that time. I know it was around the holidays.

Q. If I were to say that it occurred around April 2024, does that sound correct to you?

A. April? No, I don't know. Was it April? I have no idea. I guess. I don't remember. I don't remember. I can't tell you when it was.

Q. Okay. If I were to share with you a copy of the --

A. Are we talking about the same thing?

Q. If I were to show you a copy of the write-up, would it like refresh your memory regarding the situation?

A. You can. I don't remember.

- - -
(Exhibit No. 1 was identified.)
- - -

BY MR. LYS: (Resuming)
Q. One sec. I will share this with you. Can you see my screen?
A. I don't see anything. I don't know.
Q. Let me try to magnify it.
A. What is --
Q. Do you need me to expand it?
A. Actually, hold on. I guess -- yeah, I guess it was -- see, my dates are all off because I thought this was in October.
Q. Yeah, no problem. Just let me know when you finish reading it.
A. (Witness reads sotto voce.)
Q. Let me know when you're ready to go on to the second page.
A. Yeah. I have read it. I remember this now.
Q. All right. I'm going to go to the second page.
A. All right. Yeah, that's mine.
Q. And is that your signature where it says, Employee Signature?
A. Sure. Yes.

Q. And where it says, Date --
A. Yeah, yeah.
Q. -- that's your writing or guess it says --
A. Yeah.
Q. And at the top it says --
A. Corrective Action.
Q. Employee Corrective Action. So you do recognize this document?
A. Yeah.
Q. Okay. And so this was a document for when you said you lost a plastic part?
A. Yes.
Q. And this was the instance where you are saying that you didn't remember -- you know, you just don't remember where it was placed in?
A. I don't remember where it's at. To this day, I can't remember it. I mean, it's something I went out on my own and got my own little -- little nuts and bolts compartment and stuck it with my toolbox. There was never -- you know what I mean? It wasn't a policy. At least, I wasn't aware that we couldn't do it. Because everybody has tons of little compartments, like little plastic compartments with different nuts, bolts, and fasteners or washers, and I had -- I made my own. I went out and bought it on Amazon and created my

little plumbing -- my little plumbing box that had all my needed necessary -- leaving stuff to fix plumbing issues.

Common plumbing issues that -- that when I'm on a ladder, I would just grab that box, take it up with my ladder and I had all the -- I had all the replaceable parts with me available so I didn't have to go up and down the ladder multiple times and I didn't have to -- you know, it wasn't a big container. It was a small container. It looks like a pencil case. It was freaking awesome, actually.

Q. Yeah.

A. But once again, I don't remember -- I was honest. I told them, Hey, guys -- you know, and I told Josh, I mean, I think I told -- I think I told Danny and Derek before, and they both helped me look. And that we finally said, You know what? By the end of the day, I had to come -- I had wanted to come clean.

So -- and -- but because of this -- because of this situation, the good part about it, is that -- is that we all got -- you know what I mean, a better -- a better protocol was implemented for when it comes to tracking not just the tools, but also the actual -- the nuts and bolts we had associated in our carts.

So now -- so now I know that for a fact that

Josh went out and got everybody little containers and we would have to put down container -- we would have to associate each container -- each little housing unit in the container with the number or letter and we have to write down how many pieces, like four pieces in container one, box number four had eight pieces. And at the end of the day, we had to continually update the -- update our -- if we used a part, we marked it off and put down three, and then we updated it.

So, yes, this did happen, but I also feel like it also was a blessing because now we have a better -- CGL has a better protocol -- safety protocol on accountability.

Q. Okay. Not a problem. I just wanted to make sure we got --

A. Yeah, yeah.

Q. Do you have any other instance where you lost like a plastic part or anything like that?

A. I have no idea. Obviously, I mean, like I said, my memory is, like I said, delayed, I guess, you want to call it. But I do remember that. I thought -- I could have sworn that incident was at Christmas, but obviously, it wasn't.

Q. And then when you were talking about this incident, you'd stated that it was around the time you

were diagnosed with ADHD?
A. Yeah. That was -- I thought it was the same time, but obviously it's later.
Q. When were you diagnosed with ADHD?
A. I want to say December or November 2003, I think. I don't know. No, December early of 2004 to late 2003, I believe.
Q. Do you mean 2023 or do you mean 2003?
A. Oh, 2023, sorry.
Q. No, it's fine. You know, whenever you were diagnosed, I just want to make sure.
A. Yeah, yeah. Well, I mean, I have been diagnosed ever since I was a kid, but I haven't -- you know what I mean? I haven't been re-diagnosed until CGL brought it to my attention, so . . .
Q. Who at CGL brought it to your attention?
A. When Josh first joined the team, I guess he spent like a month or two training with my other supervisor. I forgot what his name was. But anyway, we had a conversation, and he basically said, Hey, what's going on? You're not focused. I said, Okay, well, thank you, and I went got diagnosed as soon as I could.
That, and -- and my other coworkers told me about my right arm, how they noticed I can't pick up

things and I said, I will go get that checked out too. So I just got them both checked out.

Q. Did you ever make a request for an accommodation for the ADHD or your arm?

A. I told Josh about it. Showed him the reports. He told me to pass it on to Cathy Bates. I emailed her on -- like I said, I did tell Josh, and I would talk about, Hey, we are trying different medications, and he and I would stay in contact to see if the medication -- if the medication was working, if it wasn't. Because it's only -- it's only a one-time medicine.

So it's not like -- you know what I mean? So trying to dictate when I need it the most, that's what we were working on, Josh and I. And there's other days I've asked my coworkers, Hey -- and he was -- you know what I mean? Like I said, I don't know how to explain it to you, but I had good communication with Josh about my medicines. And he would let me know, Hey, today is kind of weird.

And he even told me, Hey, if you're having one of these days, let me know. We will just send you home and no big deal. Like, I understand. He was -- he was understanding with whole thing. I just texted the information to Cathy Bates, and -- the diagnosis

and that's it. I didn't ask for any accommodations because Josh isn't -- Josh and I were handling it just fine.

Q. And you stated that the medication was like a one-time medication? Do you mean like once a day?

A. It was one time a day. Meaning -- meaning -- meaning -- meaning -- meaning, if I took it at 7 o'clock when I left the house, it only has a certain amount of effective hours.

Q. Yeah.

A. So -- but my whole thing was, okay, Josh -- we had -- I think we did Strattera, Ritalin -- I don't think -- Adderall -- I don't know exactly what the medicines were, but we tried different medicines at different -- different times, different strengths because I couldn't -- I couldn't get a medicine that I take twice a day. I couldn't do that because once I'm -- once I'm at work, I'm at work. I don't want to have to go to the car because I'll forget. My focus is not that legit when it comes to that medicine, my discipline.

Q. Yeah. And I'm assuming -- well, let me not make this assumption.

Could you take the medicine onto the property with you?

A. (Technical interruption) the courthouse, I went through a regular scanner, and that's it. And it's not magnetic, so I kept it in my pocket. So it's not like -- and plus, I was buzzed in in the back door of the -- of the employee entrance at the -- at the courthouse. And whenever I came to the jail, I don't think I ever had it with me in the jail because I think I just -- because I -- because I got transferred over to the courthouse, so I don't think I ever had it at the jail.

Because I think -- that's a big deal, dude. No offense. You don't want to take any narcotics in that thing. But the courthouse, as long as I take it in my office and it's secured, no one had any issue with it, if that make sense. At least I was never told I couldn't. I just know not to be stupid and take it in the jail.

Q. Okay. Not a problem. And then you stated that you -- that you emailed Cathy. Do you remember when that email occurred?

A. No.

Q. I'm going to just show you a copy of the email.

A. No. I just know you guys have all the documents and I didn't request them, a copy of all the

emails and text messages and everything.

- - -

(Exhibit No. 2 was identified.)

- - -

BY MR. LYS:

Q. I'm going to share that now. Well, this is going to be Exhibit Number 2. This is the August email between Romulus and Cathy. Can you see the document?

A. Yeah, I do.

Q. Are you able to read it on your screen?

A. Yes.

Q. All right. So take a chance to read it and just let me know when you've completed reading it.

A. Yeah. This is -- -- I read it, yeah.

Q. So do you remember this email exchange between you and Cathy?

A. I don't remember per se, but obviously it was sent from me. I guess, yes.

Q. Do you have any reason to doubt that this was an email exchange between you and Cathy?

A. No, it looks legit.

Q. And then if you see in August -- the bottom email says, August 18, 2023. She says she spoke with Chad and Josh?

A. Yes.

Q. I understand that you maybe need some accommodations for your health condition?

A. Yes.

Q. Is that when you had the conversation with Josh that you were talking about earlier?

A. I did, yeah. Josh -- yeah, yeah. Because I don't think Chad was there because I went to Josh and talked to Josh and -- and I remember there was an email -- there's a text message between Josh and I that I said, Hey, I got to think -- I think I've got ADHD. I'm going to go get tested.

And he sent me -- I think you told me or he sent me a text message saying, Wow, you just covered your ass, saved your ass. I'm like, holy shit. Because I guess he knows -- I don't know exactly what he was implying, but shortly after, he had a one-on-one conversation with Chad and Josh, I came back and said, Okay. I'll go get tested for ADHD. And I know he came back and said -- he said, Yeah, you covered your ass on that one. Good move. And I left it alone.

Q. And then here it says in August 2022 -- well, actually, just above that -- yeah, August 2022, it says, This is what I have so far. Still setting up appointments. Will get the other part once I have my appointments.

And there's an image there. Unfortunately, it's not coming up the email that I have. Do you remember what you sent to Cathy in August of 2022 in response to her email?

A. No, it could have been a confirmation for my appointment, it could have been -- I don't -- I really -- I can't really tell you for sure what it was, but it was obviously an update of, Hey, this is what I have so far, and -- but I don't know exactly.

Q. Yeah. It looks like she received whatever you sent her?

A. Yes.

Q. It says, Thank you Romy. Are you comfortable speaking to Josh about accommodations for the lifting or would you prefer that I begin the dialogue with him? Also, do you have a date for the ADHD --

A. Okay. Then -- then -- then -- then -- then -- then that -- that image could have been an appointment. It could have been a picture of my appointment that I set up already because I know trying to get my ADHD appointment and evaluation was not easy.

Q. And then it says just above that on August 23rd, We are currently working with the proper people to get the testing done.

A. Yes. That's what I'm saying. I'm trying

to -- getting the testing was not easy, I'll tell you that right now.

Q. So around August 2023, you were -- you already had a dialogue with Josh addressing --

A. No.

Q. You weren't to diagnosed yet with your ADHD, but you guys were already working on it or . . .

A. Well, no. What happened was, I think that's -- what happen was, I was legit -- hold on. Hold on. What about talking about? Chad -- Chad was the manager at that time that left you alone. You know what I mean? And if you had any issues, he would talk to you about it. But he -- I never chitchatted with him or we weren't "chummy" chummy.

He did his thing, I did my thing. If he had an issue, he would call me to his office, we would talk about tickets and stuff like that or say, Hey, this is what you're going to do tomorrow. But it wasn't a "chummy" chummy thing.

And then we had a meeting with Chad and Josh in regards to something. And then that's when Josh said something like, Hey, you really got to get your -- he implied I had to get my head out of my ass and start focusing more. And that's when I quickly went and did the ADD thing, and that's when I -- and that's how that

happened, I guess. Because Josh was in that meeting I had with -- with -- no, Chad was in the meeting I had with Josh.

Q. Okay.

A. So . . .

Q. So then at this time, are you already working with Josh regarding --

A. No, no, no. Josh -- no one -- I didn't think about the ADD because it never -- like I said, it never really -- like I said, I had it, what, 10 years without the -- without the medication. You know what I mean? I mean, no offense, but I worked at a hotel for five years, managed contractors, managed housekeeping, managed -- managed everything, took care of old people, and all of a -- suddenly, I'm having issues. I'm like, Okay, I've got to get it checked out because Josh and Chad brought it to my attention that, Hey, focus was an issue.

Q. I'm just going to remind you, Romulus, you've just got to let me finish the question before you answer.

A. My bad.

Q. I understand in normal conversation, that would have been fine, but it just makes it a little difficult for the court reporter. And then also, my

question wasn't actually about the ADHD because it looks like you had some lifting accommodations that was on the document that you sent to Cathy in August of 2022. Did you go to the doctors for the issues you are having with your arm at that time?

A. I did. I actually got -- I went to Emory Brain Health, their a neurological center, and they did a -- and they did a -- they did a -- what is it? They did some kind of test on me, and they found out, Hey, you have -- you have FSHD, and it's a weakness of the muscles, deteriorating of the muscles, and -- and that would explain the chicken arm.

So -- and, I mean, that would also explain the -- the -- the struggles -- at least I didn't notice it, you know what I mean? I didn't notice the struggles, but my coworkers did because I've had it for so long, my left side kind of -- kind of compensated, but obviously it wasn't working, I guess.

Q. And so you have that condition in your right arm; is that correct?

A. It's my right arm and my left hip right now, yes.

Q. And then at this time in August, was Josh working with you to accommodate --

A. Yes.

Q. -- the struggles you were having with the right arm? I mean --
A. Yes.
Q. -- left arm? Sorry, I'm confused.
A. Okay.
Q. So you're doing it again, sorry, I don't want to confuse it.
Is it your right arm that has the issue?
A. Yeah. My right arm is, yes.
Q. Right arm. And at that time, Josh was helping you -- he was working with you to, you know, accommodate the issues you were having with your right arm; is that correct?
A. Yeah. He always encouraged me not to do it by myself, especially on ladders, to always get help from another coworker. So Danny and I kind of teamed up -- teamed up a lot. If Danny and I could team up, then it was -- Derek and I would team up a lot and try to knock out things together that I needed help with like -- you know what I mean?
A six-foot ladder is easy for you probably, but my -- my ability to -- to balance became noticeable, and I was like, Okay. But Josh did help me. He said, Don't be afraid to call, and I became more of a tag team. Like, I still had my

responsibilities, but Danny and I would mostly tag team together. So we knocked out his tickets.

If there's a ticket I could do by myself, then no big deal here. We would knock it out myself -- I mean, I would knock it out myself. Like, doing a door at -- PM for a door or a gate is easy, but when it came to like using a ladder on the gate, I would literally have to reach out to Derek, Josh, or the plumber -- the old plumber, and say, Hey, can you give me a hand with the latter because I just wasn't comfortable, so . . .

Q. Got it. No, I understand. All right. I'm going to stop sharing my screen. There was one where email that occurred in August. I just want to make sure that you remember, so I'm going to share that with you too.

A. I have no idea.

- - -

(Exhibit No. 3 was identified.)

- - -

BY MR. LYS: (Resuming)

Q. I'll share it with you so you can see it. It will be Exhibit 3. Are you able to see it?

A. Yes.

Q. All right. I'll give you a moment to read

it. It is two pages, so when you finish the first page, let me know so I can scroll down to the second page for you.

A. It's the same one it looks like. You said it's two pages?

Q. Yeah.

A. Oh, there it is. That seems like the same page -- or that seems like the same email as the last time.

Q. Yes. It's just including this additional email from the same day. The last one is at the top.

A. Okay. Yes, I see that.

Q. And then it says, I've attached the form to be completed by the provider. Can you tell me when we might get the paperwork back?

A. I don't know if I did that or not. I mean, obviously, more thank likely if she did send it to me, I must have attempted to complete it, but -- but my provider is -- yeah, I don't know -- I don't know if I completed it or not, but . . .

\- - -

(Exhibit No. 4 was identified.)

\- - -

BY MR. LYS: (Resuming)

Q. And then this was the document that was

attached to -- I'm going to share it. Sorry. This is going to be Exhibit 4. Can you see the screen now?
A. Yes.
Q. Take a second to review that document. I think this is two pages also. So when you're done with the first page, just let me know so I can scroll down for you.
A. All right. I feel like I remember this, but I really don't -- I don't remember what I did with it, if I did turn it in or not, that's -- but I know I turned something into her, but . . .
Q. Well, but you do recognize this document?
A. I -- I could have. I mean, like I said, if she sent it to me, I probably printed out.
Q. Yeah.
A. I mean, like -- I mean, I can't -- it looks familiar, but I'm not going to say, Oh, yeah, I printed that out and I took it with me. And I don't know what I did with it if I did.
Q. Do you remember ever getting this document completed by your doctor?
A. I remember having a form with me, and I did take it. But -- and I gave it to the doctor, but I don't know whatever -- I don't know what came of it, if that makes sense.

Q. Okay.
A. Because -- because I don't know if I took this to the -- I think I took this to the ADD doctor, the general practitioner one, and that's all I remember. I don't know if I got it back or not, but that's the only thing I remember. I don't remember taking this to my FSHD yet either. I -- no, I don't think I took this to my FSHD doctor at Emory.
Q. Okay. All right.
A. But that's --
Q. I'm going to stop sharing my screen with you. I've got a couple of more emails that are just on this issue, so I just want to make sure that -- because the ones I have are that -- you recognize them, so we are just going to go through a couple more of them.
A. Yeah.
- - -
(Exhibit No. 5 was identified.)
- - -
BY MR. LYS: (Resuming)
Q. So I'm going to share with you what is going to be called Exhibit 5 at this point. Bear with me. It's a little slow. Okay. Can you see my screen?
A. Yeah.
Q. So just review the email and let me know when

you're done?
A. Okay. What about it?
Q. Do you remember this email between you and Cathy in September?
A. Yeah, I remember that.
Q. And it looks like you guys may have had a phone call on that date. Do you remember what that phone call --
A. Yeah. Because I responded to it, yeah.
Q. Do you remember what the phone call was about?
A. I don't remember about the phone calls. We had multiple.
Q. Yeah. So the email refers to a phone call. It says, Romy, I'm free until 11:00, give me a call.
And she leaves a phone number to call her at. Do you remember having a phone call with her on that date, September 22nd, 2023?
A. Oh, I have no idea. I can't tell you. Obviously, I said, I'm free, we will talk this morning, so I must have called her because I sent it from my work phone.
Q. Okay. But you just don't remember what that conversation was?
A. No, no.

Q. Okay. No problem.
A. No. Do you know what it was about?
Q. I don't. That's why I asked you.
A. No, no, that was so long ago, I can't remember. If it was around the time of the other emails, it probably was in regards to my medication, the FSHD or the ADD thing.
Q. I've got one more set of emails to show you.
A. Yeah.

- - -

(Exhibit No. 6 was identified.)

- - -

BY MR. LYS: (Resuming)
Q. And this is Exhibit 6. Can you see my screen?
A. Yes.
Q. Just review the email, and when you get a chance to finish reviewing it, just let me know.
A. Yeah, I read it.
Q. Do you remember this email from Cathy regarding a request for accommodation?
A. Yes, but -- I guess. I mean, if we -- if it's an email, then it's an e-mail, and I must have seen it or something, yeah. What about it?
Q. And then in the email, she has a set of

documents that she attached.

A. Yeah.

Q. Employee request for accommodation policy, employee request for accommodation form, employee accommodation medical certification form, and your -- it looks like a -- some general trades technician -- it must be a job description of your -- of your job description. Do you remember getting your accommodation documents filled out at this time around March?

A. All I know is -- I know for a fact that I had been talking to Josh this whole time and I'm like, Josh, there's nothing really to accommodate me yet at the end of the day because I'm not -- I mean, it's not -- it's not like I needed shorter hours, it's not like I need a mobility device. It's -- I was still completing my -- that's the crazy part. I was completing my tickets in a proper time, I was also performing as a plumber for that time until they had more -- I believe, if I'm correct, or I was training the plumber at that time.

So my performance never -- never died. I don't think my issue is my accommodations. I think I have established the fact that you guys may have told me to give you information. I either did not give it

to you, that's not the issue right now, in my opinion. So I think the issue -- yeah, congratulations, you established the fact that I must have dropped the ball when it comes to accommodations.

I never complained about accommodations. This was between Josh and I. Josh said, If you need any issues [sic], let me know. And, of course, talk to Cathy Bates about it. But obviously, I didn't have any issues because I wasn't -- at least it wasn't pronounced enough for me to go through and fill out this paperwork that obviously she sent to me. I don't know if I read it. I probably did. I probably looked it over.

But, yeah, I mean, why fix it if it's not broken? And I was still performing. If you look at my performance reviews, I was still managing. I wasn't behind on my tickets. I was doing more -- I was doing more -- I was doing more work than I usually was, what I was hired for. Training -- so I was training, I was taking care of the plumbing position, I was taking care of all the general trade tickets, and I was also being a big team player.

So I don't think -- I know what you are trying to establish here, but I don't think this is an issue when it comes to, yes, obviously I must have not

completed it if she keeps on texting me, Hey, fill out the information. Nor am I complaining about I wasn't accommodated right, if that makes since. That's not an issue I mean, because -- because we already went through the -- we already went through the whatever the other option -- the other path -- and they explained to me that you've got -- and I had never had an issues with you guys not accommodating me.

Josh did accommodate me. As much as you guys think he didn't, he accommodated me when I wanted to. If I needed help, I reached out to my coworkers. So it's not like I needed it to be put on paper. Yes, I told her, Hey, I got diagnosed with this, and I even told Josh, If it gets worse, I will proceed for it -- I'll move forward. But right now, between you and let's just -- you scratch -- I mean, if that makes sense.

Q. Yeah.

A. So I had all the help I needed when I was working that job. When I was performing my job, I had all the assistance I needed from my coworkers and from Josh. I had the proper support. So this -- yes, obviously, I must have dropped the ball because I don't remember this. Obviously, this is like the third time she's asking for the paperwork, and it's in March, so I

don't know what else to tell you, besides we established that obviously I didn't fill out the paperwork.
Q. All right.
A. And I'm not mad at you. It's just -- it's just -- like, I get the idea.
Q. Hey, even if you were, it's not a problem. I didn't take any offense to anything you said at all. But even if you are, it's not an issue with me. No issue.
Okay. Okay. And then in your complaint, you talk about this plumbing position that you applied for.
A. Yes.
Q. Do you remember when you applied for that plumbing position?
A. No. I just know it was available. I spoke to -- I spoke to Derek about it, and Derek was a big supporter of me, and he helped me work on my resume. I sent it to him and he physically revamped it for me. And I don't if he sent it back to me and I submitted it. We submitted it together. I know that for a fact. And then that's when I told Josh, and -- I don't know exactly when I applied for it, but I know I --
Q. Do you --
A. Go ahead.

Q. No, sorry. I thought you were done.
A. No, no, I'm pretty much done with that one.
Q. Okay.
A. So I don't know -- I don't know when -- well, whenever the position was available. How about that?
Q. Yeah.
A. I mean, because you guys have the documentation of me actually applying for it, so . . .
Q. And do you remember being interviewed for the position?
A. Yeah. I remember telling -- I remember telling Josh, Hey, I'm going to apply for the plumbing, and he said, Don't do it. He was adamant that I don't do it. And I looked -- I was kind of taken aback by it, and then finally I was like, You know what, fuck it, dude. Why not?
I mean, because -- because Derek and I talked about it and, yes, Josh told us multiple times we were the A-Team. He wants an A-Team. He wants the best of the best of the best. I mean, he wants the top of the best. He wants the -- you know what I mean? And I remember him telling -- and I remember him pulling me to my office saying, I'm disappointed you applied for it. Why would you apply for it? Now I have to give you an interview.

And during the interview -- it could have been a couple of days. I don't know exactly when. A couple weeks. But when he did interview me, he basically says he wanted someone to know -- look at something like the -- like a pump and know what the volume per gallons a minute was. I'm like, So what?

It's like at the end of the day, I checked off the boxes. You know what I mean? Nobody is going to know that offhand. I don't care who you are. The best plumber is going to have a cheat book with them. Every place has a cheat book. You have a cheat book. I mean, you don't know all the laws. You don't know all the rules. Heck, so at the end of the day, it's more or less like, can you perform the job? Yes.

So he kind of -- he kind of got mad at me and would tell me how upset he was. And during the interview, he would -- he told me that, Hey, if I have to -- if I have to hire you, I would turn around and fire you. And he said, Why fuck up a good thing -- maybe not that word maybe -- but he -- that's how I took it as. You're doing so good in your position right now. You're thriving, you get to go here, you get to go there, you get to fix different things. It's not the same thing over and over.

And my argument was, Hey, I'm the one that

found a serious issue with the plumbing -- current plumbing system. I'm the one that did the research, I'm the one that called the manufacturer and found out there's another additional valve -- or not valve, the additional screen that needed to be replaced as it wears out. And I found it, I implemented a -- how to fix it. I taught everybody else how to do it.

And since I figure that out, I also was -- I also -- the plumbing tickets start -- the repetitiveness of the plumbing ticket issues stopped. And that tells me, Hey, I must know what I'm doing because I know something is going on. You've got me swapping out a filter, cleaning out one screen and something else and having the same thing clogged within -- within days of each other or hours of each other, that tells me something is in the system.

And I thought it was the actual -- the building filter. You know how some houses -- some facilities have filters? But it was getting past that filter. So I said, Okay. And I asked around about filters. Nobody said there's no filters. So then I finally called the manufacturer and I asked him what was going on. And that's when he walked me through and I found out what was going on. I remember having to close down a couple of cellblocks, like the upper tiers

or the bottom tiers to finally investigate and try to figure this out. And I told Josh. I emailed him, Hey, what's going on?

So -- and on top of that, besides filling the plumbing role, I was also doing my other roles as a general maintenance. So my tickets were getting completed, and I couldn't understand why I was not adequate enough for the plumbing job. The only thing I can think of is because, Hey, it has to be my strength issues or it could have been the fact that -- I had no idea why.

I just know I was 100 percent adequate, and the gentleman that he interviewed -- and he told me he wanted the cr me de la cr me, the best of the best. And the gentleman he brought in was a great guy, but he has no -- he said he used to set up toilet systems for military bases. Like if they go camp out -- or not camp out, but do exercises, he'd go and then do that.

But -- and then I had to teach them everything. I would say, Hey, how would -- how do you do this? He was like, I -- I mean, he would try, but he -- I'm like, No, don't do that. You're going to flood the place.

So it kind of frustrates me to know the fact that -- the fact that I was 100 percent qualified. I

was 100 percent qualified. I did the job for the last three -- three to four months since the last plumber was there. My -- my -- my -- Chad even knew -- Chad and Josh, when they were -- when Chad was training Josh, I remember stopping them in the loading dock and I wasn't complaining, but I was saying, Hey, when are you going to let me interview for the plumbing position? Just give it to me because I'm telling you, he's having mistakes and -- and other -- my other employees saw it. My other coworkers saw it.

I mean, the -- what's her name, the -- the assistant, the manager, the one -- the secretary, she saw it. The employees saw it too. Do you know how many times I would actually leave what I was doing to make sure that their tickets -- make sure that the issues were solved because Lance was unable to do it, our current plumber, or the previous plumber? And then when I got the position, everything rode a lot smoother, you know what I mean? I took care of it.

I implemented a fixing issue, and because of that, I guarantee you tickets are not like they used to be. You know what I mean? I -- it just frustrates me, and I was really taken aback. And, of course, Josh is like, Hey, come on. You will be okay. I mean, you're doing great at your current position, no big deal, no

hard feelings. I'm like -- and, of course, I'm going to -- I'm going to -- of course, I'm going to cower down to him and say, Okay, whatever. Because, number one, I'm having issues with the ADD medicine, and I also have issues with my right arm. So I'm pretty much in the target area already, so why am I going to buck up against him? Because he has the final say.

So that's why I was more or less intimidated throughout the whole thing because, you know, I have a nervous laugh. I laughed it off. There's plenty of times he would say slight comments. I mean, he made fun of everybody, but still, for me, I laughed it off to fit in. But at the end of the day, psychologically, it did affect me. It did affect me. Like, what the heck?

I mean -- but, no, we did have an interview and the interview wasn't like -- he just basically said, I'm going to keep you where you are because if I have to hire you, I have to turn around and fire you. No hard feelings, but I want the cr me de la cr me. I went the best of the best. And obviously, I believe that. I believe that. Even though -- even though I know I could perform the job, what did frustrate me was finding out who he brought in. The guy who had less -- I mean, no offense, I mean, you had more of a plumbing

skill than he did. But since --
Q. I understand. So you gave me a lot, so you kind of answered a lot of questions that I was going to ask, so it's fine, but do you remember when that interview occurred?
A. No, I can't tell you for sure. I cannot tell you.
Q. Do you have an idea of how long it was after you applied that it occurred?
A. It could have been -- I can't tell you for that. I know -- I know it did happen because he called me and said, Okay, now I've got to do an interview. He made it a point to tell me he was -- he was upset or he did not like the idea, the fact that I went behind his back and I applied anyways.
Q. Okay. Did he ever tell you why he was upset with you? I know you kind of touched it, but . . .
A. Because like I said, I went to ask him, Hey, I want to apply for the plumbing. He says, Don't do it. And I took it as like, Okay, you told me to sit. I'm going to stand. And I talked to Derek, and Derek said, Dude, you have the qualifications. You have the qualifications.
Q. Romulus, you froze on our end.
A. (Technical interruption.) And I said --

Q. Romulus?

A. Can you hear me now?

Q. Still frozen on our end, so just give me one second before you continue answering.

A. Can you hear me now?

Q. I can hear you. But -- okay, there you go. You're back. So sorry about that. So we'll just take the question from the top again.

Did he ever tell you why he was mad that you applied?

A. I think I was a pimple on his ass at that point, because he's been looking for -- he's been looking for a plumber for a minute. And he also was -- that's my internet connection. And he also was -- I guess -- I think he was under -- under pressure from the county to -- to put bodies in there. Because I -- yeah, so . . .

But, no, he just seemed disheveled. He just seemed like he was upset, that's all. And he said, If I have to hire you, I have to turn around and fire you. He wanted the A-Team. He kept on saying, We are the A-Team. We are Forsyth County, Forsyth County. When people -- when they have contract -- future potential partners, they bring them to Forsyth County, and I want them to see how we act, how we perform, and that means

we got to look the best, we got to have the best people in place.

And I joked, just like, Hey, well, there is no such thing as A-Team as long as a couple of people are still here. And then he laughed. He said, No, we're going to get the A-Team I'm like, Okay, and I left it alone.

Q. But before -- I guess at that time, he didn't express any issues with your work, though; is that correct?

A. No, he did not. No, no, he did not. He did not. He had no issues with -- with me and my job performance. I just had a job review a couple months ago because I remember getting a pay raise on that, and he said, You did good job. You just got to slow down. You got to -- you got to think before you just jump into something, and go from there. That's all he -- that's what the review was about. But, no, during the interview, he just said, I would have to hire you, and then I would have to fire you.

Q. Okay. So I guess the only thing that ever -- I guess, I'm just trying to understand the slow down portion of that. Is that like related to --

A. The ADD, hyperactive.

Q. -- some of the missing parts and stuff like

that? Is that related too, or is it related to something else?
A. I think I was always -- I'm the eager guy to go into it feet-first. So -- so -- so if anybody -- like, if anybody was on-call, I'd say, Hey, I'll do it. I became the official on-call person when I was -- when I was employed there, because -- because I'm willing to learn and do it all. I mean, so -- and he just says, I think just slow down, meaning, like, just slow -- to slow your role. And you don't have to finish a ticket in a timely manner. But at the same time, we also had a timely manner to do a ticket, you know what I mean?
So it's one of those things, you got to balance it. But balancing is not an issue. I'm either all in or else I'm either all out with a little bit of in, if that makes sense. So he -- like I said, I jump in. I mean, if we had -- if we had a -- if we had like a ceiling tile fall, like I would go take care of that right -- right away. He says, No, go do some other tickets and then get to it, if that makes sense.
Q. Yeah, yeah. Not a problem. Not a problem at all.
And then, so after -- so you were interviewed for the position. Do you remember when -- the person who was hired for the plumbing position, do you

remember when he started?
A. It could -- it could have been shortly after I got written up. It could have been shortly after I got written up from -- for the box, for losing the -- misplacing the box. Because I remember I was training him, and I said, Hey, we've got to look for a box. And I remember taking him while doing tickets, looking for the box and stuff like that, and it was shortly after that.
Q. So sometime in April, does that sound right?
A. Could be. I'm not going to agree to that. It could be. Yeah, it was give or take a month or two, yes.
Q. You know, you said that that event occurred in April, so I'm just trying to understand.
A. Yeah. It could have been -- yeah, it could have been April. It could have been March. I don't know, yes.
Q. I's your memory. I can't speak for your memory, so . . .
A. I know the events, I just don't know the details or the dates.
Q. Yeah, yeah. Not a problem. Not a problem. And then so -- and we have this issue that occurred in June of 2024 regarding the missing keys. Can you

tell me --

A. Misplaced keys, not missing. Misplaced.

Q. Can you tell me what happened there?

A. I know the new HVAC guys -- I forgot his name -- we were trying to -- there was an issue in -- what is it? They had an issue at the administration office, either it's getting too hot or too cold. And we had the plumber -- not the plumber, I'm sorry. We had the HVAC guy trying to diagnose it out. And me and him, I started helping him around, because I also helped him get around and teach him some stuff, the basic stuff, because -- and show him where the units are.

So me and him were diagnosing it, and he's -- and we needed a set of keys for something. And once again, I'm in the administration side, right? So I had to go through one secured door, and then I could either go out into the jail to the kiosk, or else I could go straight. I go straight to the console security and get the keys that way.

So I went straight to the console security. Didn't ring the doorbell. They saw me. They buzzed me in and I said, Hey, guys, can have a set of keys? And they gave me a set of keys. And what happened was, I went back. We were doing something. We were doing

something. We had -- I know it was -- we were moving candy that was in the way, boxes of candy inside a locked -- locked door or office or whatever you want to call it, storage room.

And I don't exactly where the keys -- I don't know how -- how I misplaced them. Because, once again, I don't -- I know -- I know there's a -- I know there was an issue that we had limited time because we were either shutting the water off, or we did something. I don't know exactly what led up to that, but I remember being under -- under stress, if you want to call it. We had a timeline to get things done.

Q. Do you remember when the keys were found?

A. From what I understand, it was found shortly, within 15 minutes, of someone in administration showing up to work on Monday.

Q. And you said Monday. So where the keys lost over the weekend?

A. It was lost on Friday. I stayed for -- I clocked out at 5 o'clock, and I stayed till at least midnight looking for the keys. And, of course, I can't -- of course, I needed to be escorted into the administration office, so they couldn't really give me the time of day to look for them, and I understand that. But I did go around and tell the proper

authorities that, Hey, guys, I lost the key, this is the situation, and go from there. They found the keys Monday morning, within 15 minutes of someone arriving on shift.

Q. Did they tell you where they found the keys?

A. No, they won't tell me. There is a rumor that they found them somewhere, but I can't really say if that's -- I know that's not true where they found them, so . . .

Q. Do you -- what's the rumor where they found them?

A. Rumor was that they found him in the girls -- in the girls locker room, which I would never have been in there. There's no bloody way. I mean --

Q. Yeah.

A. -- supposedly -- even from what I understand, Josh even doesn't believe that. So I know that for a fact that -- that Josh did not believe that.

Q. Got it.

A. And so . . .

Q. So after the keys were lost, I guess, were you suspended at that time?

A. I was -- yeah, I guess I was suspended. I was told I was suspended. And I said, Okay, and that's when I called -- I think between the time I was

suspended, and -- between Friday and that Monday, I called Derek, and Derek says -- Derek says, Oh, I wouldn't worry about it, because I left my keys a while ago, and I had to call them. They called me, and I walked them into my office, and they found the keys, and that's it. And he says he didn't -- he never got reprimanded for it. He says, No big deal. It's like everybody does it.

Q. Yeah.

A. So that did make me feel a little bit better. And then when I was called into -- called into -- called into -- called into work Tuesday, that's when I was blindsided.

Q. And that's when you were told you were terminated?

A. Josh told me to come in regular time. I came in like an hour -- like I was coming in an hour early. I came to my office. He was there. He says, Hey, Dude, we got talk. And -- and I knew exactly probably what was going to happen, between you and I. And he says -- and he says, It's not my decision. The client, Forsyth County, does not -- Forsyth County Sheriff's does not want you on-site.

And I said, Okay, no big deal. I said, Okay, no big deal. I'll probably get relocated, because I

know you guys have plenty of positions. CGL has plenty of positions available. I know they have one in Buford. Either way, the point is -- so I said, Okay. And I asked him, I said, Can I have a minute to upload my data off my computer? Because that's where all my interactions with the staff and my phone. He says, No, not really. And he wished me the best of luck, and he asked me for my badge and he walked me out the door.

I mean, not too much, but -- but I did ask him, I said, Why am I getting let go? And he said, You know what, the client does not want you on-site. He did not say, CGL doesn't want you on-site. He just says, The client does not want you on-site. I said, What do you mean? Forsyth County? He says, Forsyth County Sheriff, so . . .

Q. I understand.

A. And then I remember, I said -- I said, Do you have a separation list? He says, No, you'll get that in the mail. So then I called Cathy. Cathy says, We don't -- you'll get something in the mail. Then I remember emailing her multiple times saying, Hey, I need an interview. I need to talk to someone higher up. I said, This -- this, I need clarity. She says, Well, we don't talk to ex-employees. It doesn't work that way. And I kept on emailing her, and then I seen

the separation form was failure to follow the protocol. But how do I fail if it's all that -- if it's something I've been doing this whole time? If that makes sense.

I've been carrying the keys since -- since I was actually -- since I was actually employed there that way. I also remember using -- I also remember, I think Chad -- I believe Chad also gave me another temporary key code to use to get keys, because it took them a long time to act -- to give me access to -- to the keys.

So I -- so -- so about following protocols, I think that's BS, because there's a lot of other things that went on at that -- at that site that weren't following protocols at the end of the day. I mean, I know that for a fact. So it just -- to me, that's a really bad excuse, and I figured they saw the fact that, Hey, we're going to have issues with him because of the FSHD and the ADD, so let's just get rid of him.

Q. Up until that point, like people were still helping you out with your like right arm, and like no one would -- no one stopped helping you out at work?

A. No, no, no. Once again, I'm not establishing that I wasn't properly aided because of my FSHD. It's not -- the accommodations I had no issues with. That's the point. I mean, because with -- with my issues, I

was still producing and still properly completing tickets and filling the role of the plumbing, the trainer, and helping other people out. You know what I mean? I mean, I remember helping Danny, you know, run wire. I remember helping Derek with his thing. I remember doing on-call, on -- on emergency on-calls that -- that required me to use a big wrench to -- to replace a sprinkler head. So obviously, my ability was still there, so that's not an issue.

Q. Yeah.

A. It's just, why was I let go? And I think you guys -- I think CGL thought it was an opportunity to get rid of a potential problem.

Q. And that's just based on because you have no other explanation of why you were let go?

A. I have no other explanation. No, no, it's not -- it's -- like I said, I got written up for the box, which, that was a blessing, because now they implemented a way better inventory system, perfect system. And then all of a -- suddenly, you know what I mean, all of a -- suddenly, I misplaced the keys, which I didn't lose them, I misplaced them. Losing implies that you can never find them again. I misplaced them, which I take full responsibility.

I misplaced them, but I don't believe I even

signed them out. That's the problem because -- because -- because from my understanding, after I left, there is no more going into the console office and having them give you the keys. So -- so I simply went to the door, they opened it up. If they gave me the keys using their number, they asked me for my number, I was just doing what console security -- what they were doing.

Q. Yeah.

A. Yeah. I mean, if they wanted me to go around, I went around. So that's why I'm like, What did I do wrong? And they found the keys within 15 minutes on Monday morning. So they weren't up in the ceiling. They weren't -- I don't know where they were, but obviously they was close enough where someone says, Oh, look, here's a set of keys. We found them. And then obviously Major said, Hey, we don't want him on-site, supposedly, because I was told by Josh that the client does not want you on-site, and the client is Forsyth County Sheriff.

Q. All right. My sunlight is coming behind me, so I'm like noticing that it's harder to see my face right now, sorry.

A. It's okay.

Q. Actually, I don't have too many more

questions.

Is the jail open over the weekend, or is it closed over the weekend?

A. It's 24/7.

Q. Yeah, okay.

A. Yeah, it's 24/7, so we just don't work on the weekends at that facility unless we get called in,

Q. Got it.

MR. LYS: Kate, can we five-minute break?

(A brief break was taken.)

BY MR. LYS: (Resuming)

Q. So, Romulus, are you currently working?

A. No.

Q. Have you been out of work since you've been terminated from CGL?

A. Yes.

Q. Have you been able to do any side jobs?

A. No, because -- no, because my condition has worsened, my FSHD.

Q. And have you been able to do like any other work, like Uber or things of that nature?

A. No, no. I don't -- I had a serious car accident in February of this year was pretty much T-boned, sideswiped by a car going into turn, so, no, I don't have a vehicle.

Q. Okay.
A. There's no Uber, there's no -- there's no work-from-home. Trust me, I have -- I have applied for multiple jobs and I had multiple interviews, but the problem is, once they say, Okay, let's go do your physical, and you go to see a doctor and it requires you to lift, you know what I mean? That's a red flag or else they ask you, Hey, do you have a disability? Yes. Which, I don't have to say it, but once again, if I say, no, and I get injured on the job, then that's -- that's on me, and they could get out of potential covering my medical damages.
So I -- so I'm screwed. And like I said, when I was working at CGL, after I got diagnosed with FSHD, I ended up cutting my left finger outside of work on my own time on a table saw. I severed this one because my right arm gave way and I grabbed with my left arm instinctively. So progression was happening if you liked it or not.
So, no, I can't -- nobody wants to hire me. My ADHD prevents me from doing computer work. I can't sit still. Like I said, I can't use my arms like I want to. Supposedly, I don't have enough education to become a supervisor or even becoming a support team -- like a support vehicle to transport like items.

Because I did interview a couple of times for a couple of jobs that was looking for like a support guy that was able to deliver materials and stuff like that, small stuff, like a HVAC guy, but I can't even do that because of my car accident. Not my car accident, just my -- it just, like I said, I have -- I have fender benders. My ADD prevents me from actually paying attention when I drive. I have a lapse of judgment. Not lapse of judgment, just lapse of concentration.

And they are all small fender benders, don't get me wrong. My insurance -- the one thing I have -- the good thing that happened is I don't pay 800 bucks a month for insurance anymore. You know what I mean? It is what it is, but, no, I don't work. I can't if I wanted to. I tried to get it. And I also have a doctors note that did say, Hey, due to my progression, he cannot properly work.

Q. Did you apply for unemployment benefits after --

A. I did, yes.

Q. Have you been receiving unemployment benefits?

A. We have been going on and off this last year with hearings and stuff like that. I was denied the --

I was denied the first time because I wasn't able to make my own hearing. The second time, I was denied because of improper paperwork, which I proved that I did it. Once again, I did it.

So I proved wrong, and then I had another hearing a couple weeks ago last month, and I was approved, but they haven't done anything yet. So, no, it's just -- but once again, I still play -- I still apply for three jobs a week like I'm supposed to and I tell people, Hey, I have FSHD.

It's like if I have a doctor's note, which I don't put that in my resume, but I tell people when they call me, Just to let you know, I have a weakness where I don't do well on ladders, I don't -- I don't -- ADD is effecting me, and I have no strength in my right arm.

So -- and when people hear that, they run like hell. I mean, I'm not a good candidate. I mean, I have the great skills to be -- the best job interview I had was right after I got fired. I had an interview Gainesville Housing Authority. Great position. Great job. Went through multiple interviews, and the next thing you know, went through the -- he asked me if I had any physical issues, and what am I going to do, lie to him? No.

I didn't lie to you guys when I had -- when I took the job for CGL, I didn't lie. I mean, I found out while I was at my employment with CGL the fact that I have FSHD. It wasn't a scam. And it's still not a scam.

So I just think it's kind of weird, the fact that -- it puzzles me the fact that I had issues, behavioral issues at CGL, they noticed it. I got diagnosed, I got tested, my -- I got a raise. I was told, Hey, just slow down a little bit. You're a great worker. And the next thing you know, I make two little -- one mistake that had corrective actions, and the second mistake was a key missing, and all of a sudden I get let go within six months of me telling them, Hey, I have FSHD. That's kind of sketchy. But other than that, that's it.

Q. Okay. Have you been able to apply for disability?

A. That, I got denied. Which is -- I have a lawyer for that one, but they said it would take up to three years. That's three years. Three years. And the crazy part is I'm frustrated with CGL because I had great insurance. I had the best insurance. I had cancer insurance, I had unable to work insurance, I had all this insurance that if I can't work, just in

case -- because I kept on telling myself I'm dying, I'm dying -- just in case, and now I cannot prove -- when I called the insurance company, they said, Well, since you got let go because of behavior issues, not because of your arm, I can't claim that right now.

So I tried to go through the rigmarole, and then I have to go after them once we figure this out and -- because I had great insurance. My insurance would have easily covered me for -- if I was let go because of my FSHD, and that's what -- and I'm like, you know what? I'm just going to -- I'm just going to go up the stepladder to take care of it all.

Q. And so you said two things about the Social Security disability. You said you were denied and you said that it was going to take three years. So I'm just trying to understand, did they say -- like, are you on like a waitlist for it, or are you -- how does that work?

A. You know how that works. The lawyer said it takes an average of three years to finally go through.

Q. Got it.

A. To finally go through the process, they said the first year they're going to deny you because of your age. Just because you have FSHD, they're going to look at you like, Yeah, right, your age, number one.

And the second thing is, since you have a doctor's note, we've just got to push it through before -- usually the second or third time they actually say, Okay, this guy is real. Because a lot of people -- you know what I mean? A lot of people will be missing a finger and they say they have a disability and they don't qualify.
Q. Got it.
A. So it's the way the system --
Q. I understand now. So you were denied, but what your lawyer is saying like it's just a fight that's going to take a long time?
A. Yeah, yeah, yeah. It's a three-year fight, she said. She said, Buckle up.
Q. Got it. I understand. Those are all the questions I have for you. Thank you, Romulus, for your time, and you will be hearing from me. I will be sending out our documents and interrogatories responses.
A. All right. I hope we get this figured out.
THE COURT REPORTER: Counsel, did you want to order the transcript?
MR. LYS: I do want a copy of the transcript, please.
* * *

(Whereupon, the deposition ended at 11:55 a.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)

D I S C L O S U R E

STATE OF GEORGIA Deposition of ROMULUS J. AVOLIO
COUNTY OF HENRY Tuesday, October 14, 2025

Pursuant to Article 10.B of the rules and regulations of the Board of Court Reporting of the Judicial counsel of Georgia, I make the following disclosure:

I, Kathryn Taylor, am a Georgia Certified Court Reporter. I am here as an independent contractor for Veritext Legal Solutions.

Veritext Legal Solutions was contacted by Reginald Lys, Esquire, to provide court reporting services for this deposition. The firm will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28 (c)

KATHRYN TAYLOR, CCR
No. 5082-8490-7080-9088
CERTIFIED COURT REPORTER

C E R T I F I C A T E

STATE OF GEORGIA )
COUNTY OF HENRY )

I, KATHRYN TAYLOR, Certified Court Reporter for the County of Henry and for the State of Georgia, do hereby certify:

That the foregoing transcript is a true and accurate account of evidence and testimony taken by me in the matter of ROMULUS J. AVOLIO v. CGL COMPANIES, to the best of my ability.

I further certify that the foregoing pages 5 through 88 of testimony represent a true and correct record of the evidence given upon said plea;

And I further certify that I am not a relative by blood or marriage or an employee of attorney or counsel of any of the parties in the case, nor am I financially or in any way interested in the outcome of the action.

This, the 29th day of October, 2025.

KATHRYN TAYLOR, CCR
No. 5082-8490-7080-9088
CERTIFIED COURT REPORTER

E R R A T A S H E E T

DEPOSITION OF

ROMULUS J. AVOLIO

Deposition Date: MONDAY, OCTOBER 29, 2025

Deponent: ROMULUS J. AVOLIO

Case Name: ROMULUS J. AVOLIO v. CGL COMPANIES

_____ I have read and examined the foregoing pages and the following changes are required:

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

Page ______ Line ______:____________________________________

Reason: ____________________________________________

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_________________________

ROMULUS J. AVOLIO

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of ____________, 20__, and executed the above certificate in my presence.

________________________

NOTARY PUBLIC IN AND FOR

____________ County Name

MY COMMISSION EXPIRES:

Romulus J Avolio
Reginald F Lys / rlys@constangy.com

October 29th, 2025

RE: Avolio, Romulus J. v. CGL Companies

10/14/2025, Romulus J Avolio (#7657935)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (cs-southeast@veritext.co).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**&**

**&** 2:6

**0**

**00296** 1:10
**05/03/85** 8:1

**1**

**1** 4:4 37:2
**10** 49:10
**10.b** 89:6
**10/14/2025** 93:5
**100** 65:12,25 66:1
**10:00** 1:18 5:2
**11:00** 56:15
**11:55** 88:1
**12** 18:18
**14** 1:19 13:14 89:4
**141** 31:18
**15** 17:3 74:15 75:3 80:12
**18** 45:23

**2**

**2** 4:6 45:3,7
**20** 92:15
**2000s** 17:4
**2002** 8:12,12,12
**2003** 41:5,7,8
**2003/2004** 14:20
**2004** 10:7,8 41:6
**2005** 10:7 14:19
**2010** 11:16,22
**2022** 46:21,22 47:3 50:4
**2023** 14:22,23 14:23 41:8,9 45:23 48:3 56:18
**2024** 36:15 72:25
**2025** 1:19 14:22 89:4 90:20 91:4 93:3
**21026** 89:20 90:22
**22nd** 56:18
**230** 2:7
**23rd** 47:23
**24/7** 81:4,6
**2400** 2:8
**29** 91:4
**29th** 90:20 93:3
**2:24** 1:10

**3**

**3** 4:7 52:19,23
**30** 25:25 88:2 93:16
**30303** 2:9
**37** 4:4

**4**

**4** 4:8 53:22 54:2
**400** 13:13
**404** 2:10
**45** 4:6

**5**

**5** 3:4 4:9 55:18 55:22 74:20 90:13
**5082-8490-7...** 89:22 90:24
**52** 4:7
**525-8622** 2:10
**53** 4:8
**55** 4:9
**57** 4:10

**6**

**6** 4:10 57:11,14

**7**

**7** 43:7
**7657935** 1:25 93:5

**8**

**800** 83:13
**88** 90:14
**8:00** 29:21,22

**9**

**9** 12:8
**9-11-28** 5:4 89:18
**9-11-30** 88:3
**90s** 8:6
**911** 22:24,25

**a**

**a.m.** 1:18 5:2 88:1
**aback** 62:14 66:23
**ability** 51:22 79:8 90:12
**able** 45:10 52:23 81:17,20 83:3 84:1 85:17
**above** 46:22 47:22 92:13,15 93:6
**academy** 16:25 17:5
**access** 23:15 24:19 26:8 78:9
**accessed** 26:24
**accident** 9:25 81:23 83:5,5
**accommodate** 50:24 51:12 58:13 60:9
**accommodated** 60:3,10

**accommodati...** 60:8
**accommodati...** 42:4 57:21 58:3,4,5,9
**accommodati...** 43:1 46:2 47:14 50:2 58:23 59:4,5 78:24
**accompanied** 21:13
**accompany** 21:16
**account** 90:10
**accountability** 36:3 40:13
**accounted** 36:6
**accuracy** 93:9
**accurate** 90:10 92:5
**acknowledge** 34:19
**acknowledg...** 93:12
**act** 69:25 78:9
**action** 4:5 38:6 38:7 90:19
**actions** 85:12
**activates** 26:9
**actual** 29:8 36:4,5 39:23 64:17
**actually** 8:15 11:2 14:24 16:1 25:13 26:11 27:9 28:18,21 29:1 35:24 37:11 39:11 46:22 50:1,6 62:8 66:14 78:5,5 80:25 83:7 87:3
**adamant** 62:13
**add** 36:10 48:25 49:9 55:3 57:7 67:4 70:24 78:18 83:7 84:15
**adderall** 43:13
**additional** 53:10 64:4,5
**additions** 92:7
**addressing** 48:4
**adequate** 65:8 65:12
**adhd** 41:1,4 42:4 46:10,18 47:16,21 48:6 50:1 82:21
**administration** 24:21 73:6,16 74:15,23
**admit** 35:3
**adopted** 8:5,8
**affect** 67:14,14
**afraid** 51:24
**age** 86:24,25
**ago** 7:16 11:23 57:4 70:14 76:4 84:6
**agree** 72:11
**ahead** 61:25
**aided** 78:23
**air** 12:25
**alarm** 25:3
**allotted** 93:19
**alpharetta** 12:8 14:2
**amazon** 38:25
**american** 12:6
**amount** 7:10 43:9
**amr** 11:19 12:4 12:6,6
**ands** 30:13
**annex** 34:16
**answer** 6:15,16 32:12 49:21
**answered** 17:25 68:3
**answering** 6:17 7:5 69:4
**answers** 6:3,13 7:14
**anybody** 18:8 31:3 71:4,5
**anymore** 83:14
**anytime** 26:22
**anyway** 41:19
**anyways** 68:15
**appeared** 1:22 92:14
**applicable** 93:8
**applied** 61:12 61:14,23 62:23 68:9,15 69:10 82:3
**apply** 62:12,24 68:19 83:19 84:9 85:17
**applying** 62:8
**appointment** 47:6,19,20,21
**appointments** 46:24,25
**approved** 84:7
**april** 36:15,16 36:16 72:10,15 72:17
**area** 9:1 20:25 21:3,4 67:6
**argument** 63:25
**arm** 41:25 42:4 50:5,12,20,21 51:2,4,8,9,10 51:13 67:5 78:20 82:17,18 84:16 86:5

**arms** 82:22
**arriving** 75:3
**article** 89:6
**asked** 6:20 7:6 30:11 42:16 57:3 64:20,22 77:4,8 80:6 84:23
**asking** 6:14 60:25
**ass** 46:14,14,19 48:23 69:11
**assign** 21:17 22:12
**assigned** 22:10 22:11
**assistance** 60:21
**assistant** 17:25 66:12
**associate** 40:3
**associated** 39:24
**assume** 6:22
**assuming** 43:22
**assumption** 43:23
**atlanta** 2:9 8:20
**attach** 92:8
**attached** 4:11 53:13 54:1 58:1 93:11
**attachment** 4:8
**attempted** 53:18
**attention** 41:15 41:16 49:17 83:8
**attorney** 90:17 93:13
**attorneys** 2:3
**august** 4:6 45:7 45:22,23 46:21 46:22 47:3,22 48:3 50:3,23 52:14
**authorities** 75:1
**authority** 29:14 84:21
**authorized** 26:17
**available** 39:7 61:16 62:5 77:2 93:6
**average** 86:20
**avolio** 1:5,16 3:3 5:7,12,14 19:4 32:10 89:3 90:11 91:3,5,6 92:11 93:1,4,5
**aware** 28:14 38:21
**awesome** 39:11
**awh** 1:10

**b**

**b** 4:1
**babysat** 23:11
**babysit** 20:2,6 20:21 22:22
**babysitting** 20:4,9,10,11,16 23:13
**back** 7:11 19:7 23:6 25:8 29:3 30:14,18,20 31:19 32:15 34:4,5,5,15,20 34:21 44:4 46:17,19 53:15 55:5 61:20 68:15 69:7 73:25
**backed** 18:18
**background** 7:23
**bad** 31:2 49:22 78:16
**badge** 77:8
**balance** 51:22 71:14
**balancing** 71:14
**ball** 59:3 60:23
**balson** 2:5
**based** 79:14
**bases** 65:17
**basic** 18:19 73:12
**basically** 15:19 18:4 41:20 63:4 67:17
**basis** 33:23
**bates** 42:6,25 59:8
**bear** 55:22
**beast** 31:20 33:9
**becoming** 82:24
**behavior** 86:4
**behavioral** 85:8
**believe** 8:13 31:3 41:7 58:20 67:21,22 75:17,18 78:7 79:25
**benders** 83:7 83:11
**benefits** 83:19 83:23
**best** 14:18 62:19,20,20,21 63:10 65:14,14 67:21,21 70:1 70:1 77:7 84:19 85:23 90:12

**better** 11:8 31:15 36:3,3 39:21,22 40:12 40:12 76:10 79:19
**big** 31:6,6 39:9 42:23 44:11 52:4 59:22 61:17 66:25 76:7,24,25 79:7
**birth** 7:25
**bit** 5:21,23 7:23 9:7 11:5 16:19 16:20 71:15 76:10 85:10
**bits** 35:15
**blessing** 40:11 79:18
**blindsided** 76:13
**block** 28:23
**blood** 90:17
**bloody** 75:14
**board** 12:2 33:24 34:3,3 89:7
**bodies** 69:16
**bolts** 36:5 38:19,23 39:24
**boned** 81:24
**book** 63:10,11 63:11
**born** 8:2
**bottom** 45:22 65:1
**bought** 38:25
**box** 26:9,23 27:13 35:22 39:1,5 40:6 72:4,5,6,8 79:18
**boxes** 33:19 63:8 74:2
**boy** 11:8
**brain** 50:7
**brains** 24:12
**break** 7:5,7,10 22:5 81:9,10
**breakfast** 16:15
**breaks** 7:3
**brief** 81:10
**bring** 30:18 34:5 69:24
**broken** 17:20 59:15
**brooks** 2:6
**brought** 41:15 41:16 49:17 65:15 67:24
**brush** 26:2
**bs** 78:12
**buck** 67:6
**buckle** 87:14
**bucks** 83:13
**buford** 77:3
**building** 21:13 21:21 24:20 34:17 64:18
**buildings** 20:19 28:2,3
**bunch** 11:9 21:21
**business** 15:1,6 16:2,3,6
**butt** 29:10 33:8
**butts** 30:13
**buzz** 24:7 26:25 27:19
**buzzed** 23:23 26:25 27:10 44:4 73:22
**buzzing** 24:13

**c**

**c** 2:1 3:7,11,11 5:1 89:1,18 90:1,1
**call** 13:3 15:24 23:9 28:22 30:22 40:21 48:16 51:24 56:7,8,10,14,15 56:16,17 71:5 71:6 74:4,11 76:4 79:6 84:13
**called** 5:8 15:13 28:6 30:11 55:22 56:21 64:3,22 68:11 75:25 76:2,4 76:11,11,12,12 77:19 81:7 86:3
**calling** 31:7
**calls** 28:12 56:12 79:6
**camera** 29:15
**camp** 65:17,18
**campus** 24:18
**cancer** 85:24
**candidate** 84:18
**candy** 74:2,2
**capable** 3:18
**car** 9:25 43:19 81:22,24 83:5 83:5
**care** 11:3,16 13:8 16:11,12 16:14 17:18 18:15 21:14,15 22:17 49:14 59:20,20 63:9 66:19 71:18 86:12
**caregiver** 11:17 12:13
**caregiving** 11:22
**carpenter** 9:20

**carpentry** 16:23,24
**carrying** 78:4
**carts** 35:10 39:24
**case** 39:10 86:1 86:2 90:18 91:6
**cash** 15:4
**cathy** 42:6,25 44:19 45:8,16 45:20 47:3 50:3 56:4 57:20 59:8 77:19,19
**ccr** 1:20 89:21 90:23
**ceiling** 17:20 71:18 80:14
**cellblocks** 64:25
**cells** 21:3
**center** 22:25 28:6 50:7
**certain** 7:10 23:16 43:8
**certificate** 3:8 92:1,15
**certification** 58:5
**certified** 89:10 89:23 90:6,25
**certify** 90:8,13 90:16 92:3,12
**cgl** 1:11 2:3 7:24 14:15,16 14:16,25 17:11 40:12 41:15,16 77:1,12 79:12 81:15 82:14 85:2,3,8,22 90:11 91:6 93:4
**chad** 45:24 46:7,17 48:10 48:10,20 49:2 49:17 66:3,3,4 78:7,7
**chance** 45:12 57:18
**change** 3:12 29:8
**changes** 91:9 93:10
**cheat** 63:10,11 63:11
**check** 21:14
**checked** 16:13 42:1,2 49:16 63:7
**chic** 15:7,14
**chicken** 50:12
**chitchatted** 48:13
**choose** 18:11
**christmas** 40:22
**chummy** 48:14 48:14,19,19
**civil** 88:2
**claim** 86:5
**clarify** 6:20
**clarity** 77:23
**clean** 39:18
**cleaning** 14:7 64:13
**clear** 15:18
**cleared** 15:18 15:19
**cleveland** 17:5
**client** 76:21 77:11,13 80:19 80:19
**clipboard** 34:17
**clocked** 74:20
**clogged** 64:14
**close** 64:25 80:15
**closed** 81:3
**code** 78:8
**cold** 73:7
**colleagues** 25:15,15 26:5
**college** 9:5
**come** 7:11 13:21,23 17:22 22:17,18 23:3 23:3,7 25:16 27:20 30:14,20 31:18 36:3 39:18,18 66:24 76:16
**comes** 35:9,16 36:4 39:22 43:20 59:4,25
**comfortable** 47:13 52:11
**coming** 47:2 76:17 80:21
**command** 27:11 28:6
**commencing** 1:18
**comments** 67:11
**commission** 92:21
**common** 39:4
**communication** 42:18
**companies** 1:11 2:3 11:6,7 90:11 91:6 93:4
**company** 10:4 10:5 15:3,16 86:3
**compared** 18:18
**compartment** 38:19
**compartments** 38:22,23

**compensated** 50:17
**complained** 59:5
**complaining** 60:2 66:6
**complaint** 61:11
**complete** 53:18
**completed** 45:13 53:14,20 54:21 60:1 65:7 93:16
**completing** 20:13,13 58:17 58:18 79:1
**complied** 5:3
**computer** 77:5 82:21
**concentration** 83:10
**condition** 46:2 50:19 81:18
**conditioning** 12:25
**confirmation** 47:5
**confuse** 51:7
**confused** 51:4
**congratulations** 59:2
**connection** 69:14
**consistently** 21:20
**console** 24:9,10 28:11,18 29:2 30:4,4 73:19 73:21 80:3,7
**constangy** 2:6
**constangy.com** 2:11,12 93:2
**construction** 9:10,20,23,24 10:4,5 12:23 13:1
**contact** 42:9
**contacted** 89:14
**contained** 21:6
**container** 35:17,18 39:9 39:10 40:2,3,4 40:6
**containers** 40:1
**continually** 40:7
**continue** 69:4
**contract** 69:23 89:17
**contractor** 21:12 22:9,12 89:11
**contractors** 20:5,5,11,12,17 20:18 21:17 23:12,14 25:24 49:13
**control** 23:22 24:15,17 25:5 25:6,13,20 26:10 28:7,10
**convenient** 29:11
**conversation** 6:4 36:2 41:20 46:4,17 49:23 56:24
**conversations** 5:22
**copies** 4:11 93:14
**copy** 36:19,22 44:22,25 87:23
**corner** 25:4
**correct** 10:10 28:6 36:15 50:20 51:13 58:20 70:10 90:14
**correction** 4:4
**corrections** 92:7
**corrective** 38:6 38:7 85:12
**could've** 13:20
**counsel** 87:21 89:7 90:17 93:14
**counted** 35:17
**county** 8:21,22 8:25 9:2,3 10:19,21,22,23 21:8 28:14 69:16,22,22,24 76:22,22 77:14 77:15 80:20 89:4 90:4,7 92:20
**couple** 5:20 7:7 7:16 11:6,17 25:18 31:24 55:12,15 63:2 63:3 64:25 70:4,13 83:1,2 84:6
**course** 16:17,22 18:3,8 59:7 66:23 67:1,2 74:21,22
**court** 1:1,22 5:3 6:2,6 32:8 49:25 87:21 89:7,10,15,23 90:6,25
**courtesy** 6:16
**courthouse** 27:9,9,11,15,17 27:25 28:5 30:3 34:9 44:1 44:6,9,13
**courtroom** 21:4
**courts** 21:3

**covered** 46:13 46:19 86:9
**covering** 18:9,9 82:12
**cower** 67:2
**coworker** 51:16
**coworkers** 20:14 41:24 42:16 50:16 60:11,21 66:10
**cr** 65:14,14 67:20,20
**crazy** 58:17 85:22
**created** 15:8 38:25
**criminal** 9:12
**cs** 93:15
**cts** 12:10
**cumming** 12:20 13:13,15,16
**current** 64:1 66:17,25
**currently** 47:23 81:12
**custodian** 10:1 10:14,15
**cut** 34:7
**cutting** 82:15
**cv** 1:10

**d**

**d** 3:1,11 4:1 5:1 5:4 89:1
**damage** 17:21
**damages** 82:12
**danny** 19:18 21:25 22:1 23:6 30:14 39:15 51:16,17 52:1 79:4
**dart** 11:9
**data** 77:5
**date** 7:25 38:1 47:16 56:7,18 91:4
**dates** 13:21 14:20,21 37:12 72:22
**day** 14:5 18:11 18:16,17,25 25:12 38:16 39:18 40:7 43:5,6,17 53:11 58:14 63:7,13 67:13 74:24 78:14 90:20 92:14
**days** 42:15,22 63:2 64:15 93:16
**de** 65:14 67:20
**deactivate** 25:2
**deal** 31:6,6 42:23 44:11 52:4 66:25 76:7,24,25
**december** 35:19 36:8 41:5,6
**decision** 76:21
**defendant** 1:13 2:3
**defendants** 4:3
**delayed** 40:20
**deliver** 83:3
**denied** 83:25 84:1,2 85:19 86:14 87:10
**denotes** 3:14
**deny** 86:23
**deponent** 3:2 91:5 92:1 93:13
**deposed** 5:9
**deposing** 93:13
**deposition** 1:15 5:15 6:1,11,23 7:3,13,22 17:8 88:1 89:3,16 89:17 91:2,4
**depositions** 5:20
**deputies** 28:14
**derek** 18:21 19:14,25 21:19 21:19 22:10,11 22:12,14,14 25:18 30:14 31:4 39:16 51:18 52:8 61:17,17 62:17 68:21,21 76:2 76:2,2 79:5
**description** 4:2 58:7,8
**designated** 20:25
**desk** 32:5,14,19 32:19
**details** 14:21 23:8 72:22
**deteriorating** 50:11
**device** 58:16
**diagnose** 73:9
**diagnosed** 36:9 41:1,4,11,13,14 41:22 48:6 60:13 82:14 85:9
**diagnosing** 73:14
**diagnosis** 42:25
**dialogue** 47:15 48:4
**dictate** 42:14
**died** 58:22
**dies** 15:21
**differ** 5:21

**different** 26:19 26:20,20 27:13 27:14,14,16 28:2,3 29:5 38:23 42:8 43:14,15,15,15 63:23
**difficult** 49:25
**digit** 24:2,3 25:10 26:8,14 27:12,22 28:16 29:4
**dinner** 16:16
**disability** 82:8 85:18 86:14 87:6
**disappointed** 62:23
**discipline** 43:21
**disclosure** 3:9 89:8
**discretion** 25:12
**disheveled** 69:18
**district** 1:1,2
**division** 1:3
**divvy** 18:1
**dock** 66:5
**doctor** 54:21,23 55:3,8 82:6
**doctor's** 84:11 87:1
**doctors** 50:4 83:17
**document** 38:8 38:10 45:8 50:3 53:25 54:4,12,20
**documentation** 62:8
**documents** 44:25 58:1,9 87:18
**doing** 11:18 12:3 20:12,23 22:2,23 24:25 26:11 27:1 51:6 52:5 59:17,17,18 63:21 64:11 65:5 66:14,25 72:7 73:25,25 78:3 79:6 80:7 80:8 82:21
**door** 18:22,22 24:16 44:4 52:6,6 73:17 74:3 77:8 80:5
**doorbell** 73:22
**doors** 20:1,3 25:25
**double** 24:15 25:25
**doubt** 45:19
**drag** 25:3
**drawer** 32:14
**drill** 35:15
**drive** 83:8
**drop** 30:5
**dropped** 59:3 60:23
**drywall** 17:20
**dude** 29:13 44:11 62:16 68:22 76:19
**due** 83:17
**duly** 5:9
**durations** 11:20
**duties** 17:14 22:13
**duty** 20:10
**dying** 86:1,2

**e**

**e** 2:1,1 3:1,7,11 4:1,1,6,7,8,9,10 5:1,1 57:23 88:2,3 89:1 90:1,1 91:1,1,1
**eager** 71:3
**earlier** 29:17 46:5
**early** 17:4 41:6 76:17
**easily** 86:9
**easy** 6:12 47:21 48:1 51:21 52:6
**education** 82:23
**effecting** 84:15
**effective** 43:9
**eight** 13:6 40:6
**either** 20:4 22:18 24:1,2 24:20 25:7,22 26:22 32:2,3 32:14,19 55:7 58:25 71:14,15 73:7,17 74:9 77:3
**elderly** 11:3,17
**electric** 18:19
**electrician** 17:16 19:18 20:8 23:1,2,4
**elevator** 21:20
**eliminate** 25:5
**email** 44:20,23 45:7,15,20,23 46:9 47:2,4 52:14 53:8,11 55:25 56:3,14 57:17,20,23,25
**emailed** 42:7 44:19 65:2
**emailing** 77:21 77:25
**emails** 45:1 55:12 57:6,8
**emergency** 22:24 79:6

**emory** 50:6 55:8
**employed** 71:7 78:5
**employee** 4:4 30:10 37:24 38:7 44:5 58:3 58:4,4 90:17
**employees** 66:10,13 77:24
**employment** 85:3
**encouraged** 51:14
**ended** 22:23,24 24:25 31:7 82:15 88:1
**engineer** 12:19 12:21 14:5
**entail** 17:14
**enter** 25:10 26:1,14 27:11 29:3
**entrance** 44:5
**errata** 93:11,13 93:16
**escort** 24:5
**escorted** 74:22
**especially** 51:15
**esquire** 2:4,5 89:15
**establish** 59:24
**established** 58:24 59:3 61:2
**establishing** 78:22
**estate** 15:16,17 15:20
**evaluation** 47:21
**event** 72:14
**events** 72:21
**everybody** 19:24 22:4 30:15 38:22 40:1 64:7 67:12 76:8
**evidence** 90:10 90:15
**ex** 77:24
**exactly** 10:18 43:13 46:15 47:9 61:23 63:2 74:5,10 76:19
**examination** 3:4 5:10
**examined** 91:8 92:3
**example** 22:23
**exchange** 45:15 45:20
**excuse** 78:16
**executed** 92:15
**exercises** 65:18
**exhibit** 4:4,6,7 4:8,9,10 37:2 45:3,7 52:19 52:23 53:22 54:2 55:18,22 57:11,14
**exhibits** 4:2,11
**exit** 13:14
**expand** 37:10
**expires** 92:21
**explain** 18:25 22:6 42:17 50:12,13
**explained** 60:6
**explanation** 79:15,16
**express** 13:12 70:9

**f**

**f** 2:4 90:1 93:2
**face** 80:22
**facilities** 20:19 64:19
**facility** 15:19 20:19 23:14,15 23:16,19 26:6 81:7
**fact** 25:18 39:25 58:11,24 59:3 61:21 65:10,24,25 68:14 75:18 78:15,16 85:3 85:6,7
**fail** 78:2
**fails** 93:18
**failure** 78:1
**fall** 71:18
**familiar** 26:6 54:17
**far** 46:23 47:9
**fasteners** 38:24
**faucet** 18:17
**february** 81:23
**federal** 88:2
**feed** 16:14
**feel** 40:10 54:8 76:10 92:7
**feelings** 67:1,20
**feet** 25:25 71:4
**fender** 83:7,11
**fight** 87:11,13
**figure** 11:10 31:16 64:8 65:2 86:7
**figured** 78:16 87:20
**fill** 59:10 60:1 61:2
**filled** 58:9
**filling** 65:4 79:2
**filter** 64:13,18 64:20
**filters** 64:19,21 64:21

**final** 67:7
**finally** 39:17 62:15 64:22 65:1 86:20,22
**financially** 90:18
**find** 31:9 79:23
**finding** 67:24
**fine** 7:18 19:2 41:10 43:3 49:24 68:4
**finger** 82:15 87:6
**finish** 6:16 7:5 37:15 49:20 53:1 57:18 71:10
**fire** 20:2 23:21 63:19 67:19 69:20 70:20
**fired** 31:24 84:20
**firm** 89:16
**first** 5:8 6:1 9:19 17:21 29:19 41:17 53:1 54:6 71:4 84:1 86:23
**fit** 67:13
**five** 12:18 13:9 13:9,20 35:17 35:18 49:12 81:9
**fix** 13:5 17:22 39:2 59:14 63:23 64:7
**fixing** 66:20
**flag** 82:7
**flood** 65:23
**focus** 43:19 49:17
**focused** 41:21
**focusing** 48:24
**folks** 11:3
**follow** 78:1
**following** 78:11 78:14 89:8 91:9
**follows** 5:9
**foot** 51:21
**foregoing** 90:9 90:13 91:8 92:4
**forget** 43:19
**forgetting** 23:19
**forgot** 17:9 19:15 41:19 73:4
**form** 53:13 54:22 58:4,5 78:1
**forsyth** 8:21,22 8:24 9:1,1,3,4 10:19,21,22,23 21:8 28:14 69:22,22,24 76:22,22 77:14 77:14 80:20
**forth** 23:6
**forward** 60:15
**found** 16:3 35:4,21 50:9 64:1,3,6,24 74:13,14 75:2 75:5,7,8,10,12 76:5 80:12,16 85:2
**four** 12:18,18 13:20 24:2,3 25:10 26:8,14 27:12,22 28:16 29:4 40:5,6 66:2
**freaked** 31:4
**freaking** 39:11
**free** 12:2 21:12 56:15,20
**freezing** 32:8
**freshman** 8:17
**friday** 74:19 76:1
**froze** 19:4 32:11 68:24
**frozen** 69:3
**frustrate** 67:23
**frustrated** 85:22
**frustrates** 65:24 66:22
**fshd** 50:10 55:7 55:8 57:7 78:18,23 81:19 82:15 84:10 85:4,15 86:10 86:24
**fuck** 62:15 63:19
**full** 5:12 79:24
**fulton** 12:8
**fun** 67:12
**further** 30:16 90:13,16
**future** 69:23

**g**

**g** 5:1
**gainesville** 1:3 84:21
**gallons** 63:6
**gate** 18:23 34:15 52:6,7
**general** 17:13 19:11,13 21:22 33:4 55:4 58:6 59:21 65:6
**generator** 22:1
**generators** 22:1
**gentleman** 16:12 65:13,15
**georgia** 1:2 2:9 8:20 12:9,20 13:13,15,16

89:3,8,10 90:3 90:7
**getting** 23:18 29:2 48:1 54:20 58:8 64:19 65:6 70:14 73:7 77:10
**girls** 75:12,13
**give** 6:15 7:25 16:15 24:1,3 25:11 26:16 28:23,23 30:7 52:9,25 56:15 58:25,25 62:24 66:8 69:3 72:12 74:23 78:9 80:4
**given** 90:15 92:5
**giving** 7:1
**glad** 17:9
**go** 5:19,25 7:9 7:22 8:14 9:3,5 9:13 13:4 15:22 16:14,16 16:18 20:3 22:8,17 23:22 24:5,5,6 25:1,1 25:5,8,10,15,16 25:25 26:5,11 27:4,6,8,8,9 28:19 29:1,15 30:3 33:24 34:16,16 37:17 37:20 39:8 42:1 43:19 46:11,18 50:4 55:15 59:10 61:25 63:22,23 65:17,18 69:6 70:17 71:4,18 71:19 73:17,18 73:18,19 74:25 75:2 77:10 79:11,15 80:10 82:5,6 85:14 86:4,6,7,9,12 86:20,22
**going** 5:19,25 6:22 11:12 13:1 20:7,8,23 21:22 25:3 29:12 37:20 41:21 44:22 45:6,7 46:11 48:18 49:19 52:13,15 54:1 54:2,17 55:11 55:15,21,21 62:12 63:8,10 64:12,23,24 65:3,22 66:7 67:1,2,2,6,18 68:3,21 70:6 72:11 76:20 78:17 80:3 81:24 83:24 84:24 86:11,11 86:15,23,24 87:12
**good** 10:6 16:23 39:20 42:18 46:20 63:19,21 70:15 83:13 84:18
**grab** 29:9 39:5
**grabbed** 82:17
**graduated** 10:7
**great** 65:15 66:25 84:19,21 84:21 85:10,23 86:8
**guarantee** 66:21
**guess** 6:1 7:21 10:6 11:8,24 12:1 13:6,22 14:18 15:11,24 19:9 21:10,10 24:12,17 25:14 27:13,22 28:7 31:2,15,19,20 36:17 37:11,11 38:3 40:20 41:17 45:18 46:15 49:1 50:18 57:22 69:15 70:8,21 70:22 75:21,23
**guy** 15:16 17:15,17 18:21 19:15 22:21 36:11 65:15 67:24 71:3 73:9 83:3,4 87:4
**guys** 20:2 27:1 33:12 39:14 44:24 48:7 56:6 58:24 60:8,9 62:7 73:4,23 75:1 77:1 79:12 85:1

**h**

**h** 3:7 4:1 91:1
**half** 30:7
**hall** 13:5
**hand** 52:10
**handful** 31:16
**handled** 19:21
**handles** 22:13
**handling** 43:2
**hang** 22:2
**hanging** 17:19 17:19
**happen** 33:6 40:10 48:9 68:11 76:20
**happened** 19:6 35:18 48:8 49:1 73:3,24 83:13

**happening** 82:18
**hard** 67:1,20
**harder** 80:22
**haulers** 15:7,14
**head** 12:25 48:23 79:8
**health** 46:2 50:7
**hear** 19:5 69:2 69:5,6 84:17
**hearing** 84:2,6 87:17
**hearings** 83:25
**heck** 63:13 67:15
**hell** 20:8 84:18
**help** 18:3 22:16 51:15,19,23 60:11,19
**helped** 18:21 18:22 39:16 61:18 73:11
**helping** 20:14 51:11 73:10 78:20,21 79:3 79:4,5
**henry** 89:4 90:4 90:7
**hesitate** 6:20 7:4
**hey** 7:6 19:25 21:22 23:24 25:6,21 26:25 29:13 30:22,23 30:25 35:17 39:14 41:20 42:8,16,19,21 46:10 47:8 48:17,22 49:17 50:9 52:9 60:1 60:13 61:7 62:12 63:17,25 64:11 65:2,9 65:20 66:6,24 68:18 70:3 71:5 72:6 73:23 75:1 76:18 77:21 78:17 80:17 82:8 83:17 84:10 85:10,15
**high** 9:3
**higher** 77:22
**highway** 12:8
**hip** 50:21
**hire** 63:18 67:19 69:20 70:19 82:20
**hired** 59:19 71:25
**hold** 19:5,5 37:11 48:9,10
**holding** 21:3
**holiday** 13:12 13:12,18,25
**holidays** 36:13
**holy** 46:14
**home** 30:17 33:7 35:22 42:23 82:3
**honest** 10:25 39:14
**hope** 87:20
**hospital** 11:4 11:20 12:7,8
**hot** 18:16 73:7
**hotel** 12:16,17 12:19,22 13:2 13:7,10 14:1,9 14:13 49:12
**hour** 13:6 30:6 30:7 76:17,17
**hours** 29:7 43:9 58:15 64:15
**house** 15:19,21 15:22 43:8
**housekeeping** 49:13
**houses** 64:18
**housing** 40:3 84:21
**hundreds** 28:12
**hunt** 28:19
**hurt** 25:21
**hustle** 16:18
**hustling** 16:8
**hvac** 17:16 19:15 73:4,9 83:4
**hyperactive** 70:24

**i**

**ice** 14:8
**idea** 11:13 14:17 36:17 40:19 52:17 56:19 61:6 65:11 68:8,14
**identified** 37:2 45:3 52:19 53:22 55:18 57:11
**image** 47:1,18
**implemented** 39:22 64:6 66:20 79:19
**implied** 48:23
**implies** 79:22
**implying** 46:16
**important** 5:24 18:12,14,17 19:24
**improper** 84:3
**incident** 34:22 35:18 40:22,25
**include** 18:5
**including** 1:22 53:10
**incomplete** 3:13
**incorrect** 3:15

**independent** 89:11
**indiscernible** 3:18
**individual** 92:12,13
**indoor** 18:5
**information** 42:25 58:25 60:2
**injured** 82:10
**inn** 13:12,12,18 13:25
**inside** 23:22 35:12,13 74:2
**inspection** 20:2
**inspections** 18:22 21:20,21
**installed** 22:25
**instance** 38:13 40:17
**instinctively** 82:18
**insurance** 83:12,14 85:23 85:23,24,24,25 86:3,8,8
**interactions** 77:6
**interested** 90:19
**internet** 69:14
**interrogatories** 87:18
**interruption** 3:12 19:3 32:7 44:1 68:25
**interview** 62:25 63:1,3,17 66:7 67:16,17 68:5 68:12 70:19 77:22 83:1 84:19,20
**interviewed** 62:9 65:13 71:23
**interviews** 82:4 84:22
**intimidated** 67:8
**inventoried** 35:12,13
**inventory** 79:19
**investigate** 65:1
**irrigate** 16:18 16:19
**irrigation** 16:17
**issue** 44:14 48:16 49:18 51:8 55:13 58:23 59:1,2 59:25 60:4 61:9,10 64:1 66:20 71:14 72:24 73:5,6 74:8 79:9
**issues** 14:6 39:3 39:4 48:12 49:15 50:4 51:12 59:7,9 60:7 64:10 65:10 66:16 67:4,5 70:9,12 78:17,24,25 84:24 85:7,8 86:4
**item** 34:2
**items** 15:23 36:6 82:25

**j**

**j** 1:5,16 3:3 5:7 89:3 90:11 91:3,5,6 92:11 93:1,4,5
**jail** 22:25 24:12 24:20,20 26:21 26:22 27:15 28:1,8,10 30:4 33:13 44:6,7 44:10,17 73:18 81:2
**job** 1:25 9:19 11:22,25 12:1 13:25 18:13,13 58:7,7 60:20 60:20 63:14 65:8 66:1 67:23 70:12,13 70:15 82:10 84:19,22 85:2
**jobs** 16:5,10 81:17 82:4 83:2 84:9
**jobsite** 20:25
**joined** 41:17
**joked** 70:3
**josh** 22:20 30:22,22 35:2 35:23 36:10 39:15 40:1 41:17 42:5,7 42:15,18 43:2 43:2,11 45:24 46:5,6,7,8,9,17 47:14 48:4,20 48:21 49:1,3,7 49:8,16 50:23 51:10,23 52:8 58:12,13 59:6 59:6 60:9,14 60:22 61:22 62:12,18 65:2 66:4,5,23 75:17,18 76:16 80:18
**judgment** 83:9 83:9
**judicial** 89:7
**jump** 70:16 71:16
**june** 72:25

**junior** 8:15,18
**justice** 9:12

**k**

**kate** 81:9
**kathryn** 1:20 89:10,21 90:6 90:23
**keep** 33:20 67:18
**keeps** 60:1
**kept** 44:3 69:21 77:25 86:1
**key** 26:1,9,11 26:15,15 27:13 28:23 31:22 75:1 78:8 85:13
**keys** 23:15,19 23:25 24:3,14 25:4,7,11,17,21 26:16,20,22 27:2,3,4,18,20 27:23,25,25 28:5,8,15,19,22 28:24,25 29:3 29:9,15,25 30:5,10,11,18 30:20,24 31:4 31:6,7,23 32:3 32:14,16,22,23 33:6 34:18 72:25 73:2,15 73:20,23,24 74:5,13,17,21 75:2,5,21 76:3 76:5 78:4,8,10 79:21 80:4,6 80:12,16
**kid** 41:13
**kind** 9:24 42:20 50:9,17,17 51:16 62:14 63:15,15 65:24 68:3,17 85:6 85:15
**kiosk** 73:18
**knew** 20:21 22:4 66:3 76:19
**knock** 51:19 52:4,5
**knocked** 52:2
**know** 5:18 6:3 6:24,24,25 7:15,18,19,20 7:21 8:5,6 9:14 9:15,23,23,24 10:18,25 11:1 11:1,2,10,13,16 11:21 12:19 13:17,19,20 14:7,11,12 15:12 16:4,21 18:12,24 19:6 21:11 22:5,6 22:16 25:17 26:3,6 27:7,17 28:13 29:6,15 30:9,13,14,15 30:24 31:1,3,3 31:15,21 33:2 33:15 34:25,25 35:5,5,6,15,23 36:9,11,12,16 37:7,14,17 38:14,20 39:9 39:14,17,21,25 41:6,10,14 42:13,16,17,19 42:22 43:13 44:16,24 45:13 46:15,18 47:9 47:20 48:11 49:11 50:15 51:11,20 53:2 53:16,19,19 54:6,10,18,24 54:24 55:2,5 55:25 57:2,18 58:11,11 59:7 59:12,23 61:1 61:16,21,22,23 62:4,4,15,21 63:2,4,5,8,9,12 63:12 64:11,12 64:18 65:12,24 66:13,19,22 67:9,23 68:11 68:11,17 71:12 72:14,18,21,21 73:4 74:1,6,7,7 74:7,10 75:8 75:17 77:1,2 77:11 78:15 79:3,4,20 80:14 82:7 83:14 84:13,23 85:11 86:11,19 87:5
**knowing** 27:23
**knows** 22:2 46:15

**l**

**l** 89:1
**la** 65:14 67:20
**ladder** 39:5,6,8 51:21 52:7
**ladders** 51:15 84:14
**lance** 19:16 66:16
**landscaping** 15:3 16:19
**lanier** 9:8
**lapse** 83:8,9,9
**larry** 9:22,22 9:23
**late** 23:3 41:7
**laugh** 67:10
**laughed** 67:10 67:12 70:5
**laura** 2:5
**laws** 63:12

**lawyer** 85:20 86:19 87:11
**lbalson** 2:12
**learn** 71:8
**leave** 32:2,14 32:21 66:14
**leaves** 56:16
**leaving** 39:2
**led** 74:10
**left** 28:21 29:24 30:10,23 31:4 31:7 32:19 43:8 46:20 48:11 50:17,21 51:4 70:7 76:3 80:2 82:15,18
**legal** 89:12,14 93:23
**legit** 13:6,8 15:2 43:20 45:21 48:9
**letter** 40:4
**lie** 84:24 85:1,2
**life** 19:15 23:20 25:2
**lift** 82:7
**lifting** 47:14 50:2
**liked** 82:19
**likely** 53:17
**limited** 74:8
**line** 91:10,12 91:14,16,18,20 91:22,24
**list** 26:16 28:18 77:18
**literally** 23:23 31:17 52:8
**little** 5:21,23 7:23 9:7 11:5 16:19,20 38:18 38:18,22,23 39:1,1 40:1,3 49:24 55:23 71:15 76:10 85:10,12
**live** 8:8,11 11:17 30:16
**lived** 8:10
**living** 8:24
**llp** 2:6
**loading** 66:5
**lobby** 21:15 28:25 29:8
**located** 34:2
**lock** 32:4,4
**locked** 32:19 33:20 74:3,3
**locker** 75:13
**long** 8:11 9:13 9:15 10:15 11:11,20 12:17 13:17 14:10 26:12 44:13 50:17 57:4 68:8 70:4 78:9 87:12
**longer** 11:13
**look** 11:1 39:16 59:15 63:4 70:1 72:6 74:24 80:16 86:25
**looked** 59:12 62:14
**looking** 7:20 32:6 69:12,13 72:7 74:21 83:2
**looks** 28:11 31:2 39:10 45:21 47:10 50:2 53:4 54:16 56:6 58:6
**lose** 35:4,20 79:22
**losing** 72:4 79:22
**lost** 31:5,23 34:23,25,25 35:24 36:1 38:11 40:17 74:17,19 75:1 75:21
**lot** 16:14 18:10 18:23 20:5,9 22:4 23:11,11 25:14,22 29:6 51:17,18 66:18 68:2,3 78:12 87:4,5
**louise** 11:21 16:11
**lowest** 20:6 22:21
**luck** 77:7
**luke** 11:21 16:11
**lunch** 22:5,18 22:19 32:15,22
**lys** 2:4 3:4 5:11 32:9 37:4 45:5 52:21 53:24 55:20 57:13 81:9,11 87:23 89:14 93:2

**m**

**m** 3:7
**machine** 14:8
**machinery** 14:7
**mad** 61:5 63:15 69:9
**made** 38:24 67:11 68:13
**magnetic** 44:3
**magnify** 37:8
**mail** 4:6,7,8 57:23 77:19,20
**mails** 4:9,10
**maintaining** 14:6
**maintenance** 12:19,21 13:3

14:4,4,9 17:13 18:23,23 19:11 26:15 65:6
**major** 80:17
**make** 6:24 7:14 7:20 16:20,20 20:23,24,25 21:4 23:7 40:14 41:11 42:3 43:23 44:15 52:14 55:13 66:15,15 76:10 84:2 85:11 89:8
**makes** 18:24 19:25 20:8 33:9 49:24 54:25 60:3,16 71:16,20 78:3
**making** 21:5
**managed** 49:13 49:13,14,14
**management** 9:10 12:23
**manager** 48:11 66:12
**managing** 59:16
**manner** 71:11 71:12
**manufacturer** 64:3,22
**march** 58:10 60:25 72:17
**marked** 40:8
**marriage** 90:17
**materials** 83:3
**matter** 90:11
**mean** 8:6 11:9 11:9,21 12:24 14:6,22 17:7 17:25 20:16 22:6,7 25:14 26:3 27:16 28:13 29:12 30:24 31:1 33:14,17 34:7 34:11,24 35:15 35:22 38:17,20 39:15,21 40:19 41:8,8,12,14 42:13,17 43:5 48:12 49:11,12 50:13,15 51:2 51:20 52:5 53:16 54:13,16 54:16 57:22 58:14 59:14 60:4,16 62:7 62:17,20,21 63:8,12 65:21 66:11,19,22,24 67:11,16,25,25 71:8,12,17 75:14 77:9,14 78:14,25 79:4 79:4,21 80:10 82:7 83:14 84:18,18 85:2 87:5
**meaning** 43:6,6 43:7,7,7 71:9
**means** 69:25
**meant** 16:24
**medical** 11:19 12:7 58:5 82:12
**medication** 42:10,10 43:4 43:5 49:11 57:6
**medications** 42:9
**medicine** 36:10 42:12 43:16,20 43:24 67:4
**medicines** 42:19 43:14,14
**meet** 28:24 29:8
**meeting** 48:20 49:1,2
**member** 28:25
**memory** 36:23 40:20 72:19,20
**mentioned** 15:23 26:4
**message** 46:9 46:13
**messages** 45:1
**midnight** 74:21
**military** 65:17
**mine** 10:6 11:8 17:17 31:15 37:22
**minute** 32:6 63:6 69:13 77:4 81:9
**minutes** 7:7 74:15 75:3 80:13
**miscellaneous** 36:6
**misplace** 35:20
**misplaced** 31:5 35:1 73:2,2 74:6 79:21,22 79:23,25
**misplacing** 72:5
**missed** 29:17
**missing** 28:19 70:25 72:25 73:2 85:13 87:5
**mistake** 85:12 85:13
**mistakes** 66:9
**mobility** 58:16
**moment** 52:25
**monday** 74:16 74:17 75:3 76:1 80:13 91:4

**money** 16:21 20:9
**monitors** 28:13
**month** 41:18 72:12 83:14 84:6
**months** 9:25 10:4 66:2 70:13 85:14
**morning** 16:14 29:19 56:20 75:3 80:13
**move** 8:4 14:14 46:20 60:15
**moved** 8:21 11:16
**moving** 15:16 74:1
**multiple** 29:5 39:8 56:13 62:18 77:21 82:4,4 84:22
**muscles** 50:11 50:11

**n**

**n** 2:1 3:1,7,11 4:1 5:1
**name** 5:13 13:10 15:9 16:2 19:15 34:2 41:19 66:11 73:5 91:6 92:20
**named** 92:13
**names** 11:9
**narcotics** 44:12
**nature** 26:2 31:19 33:9 81:21
**necessary** 39:2 92:7
**need** 6:2,8 7:3 7:14 22:15 23:15 37:10 42:14 46:1 58:16 59:6 77:22,22,23
**needed** 12:11 17:18 24:6 26:22 33:21,22 33:24 34:11,14 39:2 51:19 58:15 60:11,12 60:19,21 64:5 73:15 74:22
**nervous** 67:10
**neurological** 50:7
**neuropathy** 16:13
**never** 15:6 16:2 35:4,12,16 38:20 44:15 48:13 49:9,9 58:22,22 59:5 60:7 75:13 76:6 79:23
**new** 14:9 35:8,9 35:9,11 36:11 36:11 73:4
**nice** 8:4
**night** 16:16
**nod** 6:4,6
**normal** 5:24 6:3 33:23 49:23
**normally** 29:18 33:12
**northern** 1:1
**northwest** 2:7
**notary** 92:19
**note** 83:17 84:11 87:2 93:10
**notice** 50:14,15
**noticeable** 51:23
**noticed** 41:25 85:8
**noticing** 80:22
**november** 14:24 36:8 41:5
**number** 34:2 40:4,6 45:7 56:16 67:3 80:6,6 86:25
**numbers** 13:21
**nuts** 36:5 38:18 38:23 39:24

**o**

**o** 3:11 5:1 89:1
**o'clock** 43:8 74:20
**o.c.g.a.** 5:4 88:3 89:18
**oath** 6:23
**obviously** 6:5 17:9 40:19,23 41:3 45:17 47:8 50:18 53:17 56:20 59:8,11,25 60:23,24 61:2 67:21 79:8 80:15,17
**occurred** 36:7 36:14 44:20 52:14 68:5,9 72:14,24
**october** 1:19 14:24 37:13 89:4 90:20 91:4 93:3
**offense** 44:12 49:12 61:8 67:25
**offhand** 63:9
**office** 24:11 30:2,3,5,6 31:7 31:8 32:25 44:14 48:16 62:23 73:7

74:3,23 76:5 76:18 80:3
**officer** 26:10 28:11,24 31:8
**official** 16:6 71:6
**oh** 9:11 10:6,21 13:12 14:17 15:7 16:7,24 18:7 21:23 28:16 30:1 32:1 41:9 53:7 54:17 56:19 76:2 80:16
**ohio** 8:10 17:1 17:4
**okay** 5:17 6:10 7:2,8,12,17 11:14 12:3 13:24 19:8 20:2 21:1 22:16 23:7,23 33:5,10 35:11 36:19 38:10 40:14 41:21 43:11 44:18 46:18 47:17 49:4,16 51:5 51:23 53:12 55:1,9,23 56:2 56:23 57:1 61:11,11 62:3 64:20 66:24 67:3 68:12,16 68:20 69:6 70:6,21 75:24 76:24,24 77:3 80:24 81:5 82:1,5 85:17 87:4
**old** 8:6 49:14 52:9
**once** 24:4 36:1 39:13 43:5,17 43:18 46:24 73:15 74:6 78:22 82:5,9 84:4,8 86:7
**ones** 55:14
**open** 81:2
**opened** 80:5
**operated** 26:9
**operation** 24:12
**opinion** 59:1
**opportunity** 79:12
**option** 60:6
**oral** 6:3
**order** 87:22
**original** 4:11 92:9
**outcome** 90:19
**outside** 82:15
**oversaw** 13:1
**own** 14:25 15:1 17:24 20:12 24:3 27:12,20 33:17,18,18 35:9,10 38:18 38:18,24 82:16 84:2
**owned** 16:1
**owning** 15:4

**p**

**p** 2:1,1 3:11 5:1
**page** 3:2 4:2 37:18,21 53:2 53:3,8 54:6 91:10,12,14,16 91:18,20,22,24
**pages** 53:1,5 54:5 90:13 91:8
**paid** 11:25 20:6
**pain** 29:10 33:8
**painted** 13:5
**panel** 23:22 25:6
**paper** 34:1 60:12 92:8
**papers** 15:10
**paperwork** 30:6,8 53:15 59:11 60:25 61:3 84:3
**part** 38:11 39:20 40:8,18 46:24 58:17 85:22
**participate** 20:4
**particularly** 5:22
**parties** 1:22 90:18
**partners** 69:24
**parts** 35:1,1,4,9 35:12 36:5 39:7 70:25
**pass** 42:6
**passed** 11:23
**past** 7:15 64:19
**patch** 17:22
**path** 60:6
**patients** 12:9
**pay** 16:18 70:14 83:13
**paying** 83:8
**peachtree** 2:7
**pencil** 39:10
**people** 13:4 16:6,18 25:14 30:16 33:6 47:23 49:14 69:23 70:1,4 78:19 79:3 84:10,12,17 87:4,5
**percent** 65:12 65:25 66:1
**perfect** 79:19
**perform** 63:14 67:23 69:25

**performance** 58:22 59:16 70:13
**performing** 58:19 59:15 60:20
**person** 18:2 22:8 71:6,24
**ph** 3:17
**phone** 18:1 28:12,22 56:7 56:8,10,12,14 56:16,17,22 77:6
**phonetically** 3:17
**phrase** 3:14
**physical** 82:6 84:24
**physically** 27:10 29:3,3 61:19
**pick** 18:14 41:25
**picture** 47:19
**pieces** 40:5,5,6
**pimple** 69:11
**pin** 24:2,3 25:10 26:8,14 27:12,22 28:17 29:4
**place** 13:8 63:11 65:23 70:2
**placed** 31:22 38:15
**plaintiff** 1:7
**plastic** 38:11 38:23 40:18
**play** 22:20 84:8
**player** 59:22
**plea** 90:15
**please** 5:12 20:1 87:24
**plenty** 25:23 28:20 30:13 67:10 77:1,1
**pliers** 35:14
**plumber** 17:21 18:10,10,11 19:16,17,21,23 36:11 52:9,9 58:19,21 63:10 66:2,17,17 69:13 73:8,8
**plumbing** 9:10 9:14 16:22,23 18:5,14 19:22 33:21 35:4 39:1,1,2,4 59:20 61:12,15 62:12 64:1,2,9 64:10 65:5,8 66:7 67:25 68:19 71:25 79:2
**plus** 10:17 18:13 44:4
**pm** 52:6
**pocket** 44:3
**point** 55:22 68:13 69:12 77:3 78:19,25
**pole** 20:7 22:21
**policy** 38:20 58:3
**portion** 26:21 70:23
**portions** 23:16
**position** 14:13 17:12 59:20 61:12,15 62:5 62:10 63:21 66:8,18,25 71:24,25 84:21
**positions** 77:1 77:2
**potential** 69:23 79:13 82:11
**practice** 33:4,4
**practitioner** 55:4
**prefer** 47:15
**presence** 92:16
**pressure** 69:15
**pretty** 16:23 62:2 67:5 81:23
**prevents** 82:21 83:7
**previous** 66:17
**printed** 54:14 54:17
**prison** 21:2
**probably** 31:10 32:13,13 51:21 54:14 57:6 59:12,12 76:19 76:25
**problem** 5:19 11:14 37:14 40:14 44:18 57:1 61:7 71:21,21 72:23 72:23 79:13 80:1 82:5
**procedure** 23:18 24:22,24 88:3
**procedures** 12:10
**proceed** 60:14
**process** 86:22
**produced** 4:12
**producing** 79:1
**progression** 82:18 83:17
**prohibited** 89:17
**projects** 20:15
**pronounced** 59:10
**proper** 47:23 58:18 60:22 74:25

**properly** 14:7 78:23 79:1 83:18
**property** 28:21 32:3,21 43:24
**prophete** 2:6
**protocol** 21:11 33:10 35:9,11 39:22 40:12,12 78:1
**protocols** 78:11 78:14
**prove** 86:2
**proved** 84:3,5
**provide** 89:15
**provider** 53:14 53:19
**psychologica...** 67:13
**public** 92:19
**pull** 11:1
**pulling** 62:22
**pump** 63:5
**pursuant** 1:17 88:2 89:6
**push** 26:13 87:2
**put** 20:9 22:21 23:14 24:18 25:2,2 29:3,13 34:2,4,15 40:2 40:9 60:12 69:16 84:12
**putting** 24:4 25:9
**puzzles** 85:7

**q**

**qualifications** 68:22,23
**qualified** 65:25 66:1
**qualify** 87:7
**question** 6:4,14 6:17,18,19,21 6:22,25 7:6 49:20 50:1 69:8
**questions** 6:3,9 6:13 68:3 81:1 87:16
**quickly** 48:24
**quotations** 23:11

**r**

**r** 2:1 3:11,11 5:1 89:1 90:1 91:1,1
**raise** 70:14 85:9
**range** 21:12
**reach** 52:8
**reached** 60:11
**read** 37:19 45:10,12,14 52:25 57:19 59:12 91:8 92:3 93:9
**reading** 37:15 45:13
**reads** 37:16
**ready** 37:17
**real** 16:2,2 87:4
**realized** 32:18
**really** 10:25 11:25,25 13:20 14:12 22:7 25:19 34:10 47:7,7 48:22 49:10 54:9 58:13 66:23 74:23 75:7 77:7 78:16
**reason** 25:20 27:22 45:19 91:11,13,15,17 91:19,21,23,25 93:11
**receipt** 93:17
**received** 47:10
**receiving** 83:22
**recognize** 38:8 54:12 55:14
**record** 5:13 7:9 90:15 92:5
**red** 82:7
**referenced** 93:6
**referring** 8:20 24:8
**refers** 56:14
**refresh** 36:23
**regarding** 33:12 36:23 49:7 57:21 72:25
**regards** 48:21 57:6
**reginald** 2:4 89:14 93:2
**regular** 5:21 44:2 76:16
**regulations** 89:6
**related** 70:23 71:1,1
**relative** 90:16
**relocated** 76:25
**remember** 7:16 7:17 15:4 17:7 34:24 36:7,17 36:18,25 37:19 38:14,15,16,17 39:13 40:21 44:19 45:15,17 46:8 47:3 52:15 54:8,9 54:20,22 55:5 55:6,6 56:3,5,7 56:10,12,17,23 57:5,20 58:8 60:24 61:14 62:9,11,11,22 62:22 64:24 66:5 68:4

70:14 71:24 72:1,5,7 74:10 74:13 77:17,21 78:6,6 79:4,5,6
**remembered** 32:6
**remind** 49:19
**reminded** 32:16
**remove** 15:23
**removing** 15:16
**renovations** 13:2
**repairs** 12:24 12:25
**repeat** 32:10,12
**repetitiveness** 64:10
**replace** 17:20 79:8
**replaceable** 39:7
**replaced** 64:5
**reporter** 1:22 5:3 6:2,6,12 32:8 49:25 87:21 89:11,23 90:6,25
**reporter's** 3:9
**reporting** 89:7 89:15
**reports** 42:6
**represent** 90:14
**representing** 92:12
**reprimanded** 31:11 76:7
**request** 42:3 44:25 57:21 58:3,4
**required** 79:7 91:9
**requirement** 21:7
**requirements** 5:4
**requires** 82:6
**research** 64:2
**reserved** 88:4
**respond** 6:17
**responded** 56:9
**response** 7:1 12:7 47:4
**responses** 87:19
**responsibilities** 52:1
**responsibility** 79:24
**restate** 6:21
**resume** 11:1 61:18 84:12
**resuming** 32:9 37:4 52:21 53:24 55:20 57:13 81:11
**return** 26:9 29:25 30:2,11 30:12 32:22,23 93:13,16
**returned** 34:11
**revamped** 61:19
**review** 54:4 55:25 57:17 70:13,18 93:7
**reviewing** 57:18
**reviews** 59:16
**rid** 15:25 78:18 79:13
**right** 5:19 10:23 15:21 18:2 27:12 30:3,4,23 31:19 36:9 37:20,22 41:25 45:12 48:2 50:19,21,21 51:2,8,9,10,12 52:12,25 54:8 55:9 59:1 60:3 60:15 61:4 63:22 67:5 71:19,19 72:10 73:16 78:20 80:21,23 82:17 84:15,20 86:5 86:25 87:20
**rigmarole** 86:6
**ring** 73:22
**ritalin** 43:12
**rlys** 2:11 93:2
**road** 13:22
**rode** 66:18
**role** 65:5 71:10 79:2
**roles** 65:5
**romania** 8:3
**romulus** 1:5,16 3:3 5:7,14 45:8 49:19 68:24 69:1 81:12 87:16 89:3 90:11 91:3,5,6 92:11 93:1,4,5
**romy** 47:13 56:15
**room** 12:2 23:22 24:13,15 24:17 25:2,6 25:13,16,19,20 27:11 28:1,5,7 28:10 74:4 75:13
**rooms** 13:4
**routine** 13:3
**rule** 22:19 88:2
**rules** 5:20,23 63:13 88:2 89:6
**rumor** 75:6,10 75:12

**run** 79:4 84:17

**s**

**s** 2:1 3:7,11,11 4:1 5:1 89:1,1 91:1
**safety** 17:17 18:21 19:15 23:20 25:2 40:12
**sale** 15:16
**sales** 15:18,20
**saved** 46:14
**saw** 33:22 34:1 66:10,10,13,13 73:22 78:16 82:16
**saying** 6:5 38:14 46:13 47:25 62:23 66:6 69:21 77:21 87:11
**says** 31:6 37:23 38:1,3,5 45:23 45:23 46:21,23 47:13,22 53:13 56:15 63:4 68:19 71:8,19 76:2,2,6,7,18 76:21,21 77:6 77:13,14,18,19 77:23 80:15
**scam** 85:4,5
**scanner** 44:2
**schedule** 12:24
**school** 8:14 9:3 9:7,9,13,16,18 10:1,10,12,16 10:19 16:24
**schooling** 9:6 17:6
**schools** 10:21
**scj** 1:10
**scott** 19:16 30:15,21,21
**scratch** 60:16
**screen** 37:6 45:10 52:13 54:2 55:11,23 57:15 64:5,13
**screened** 29:1,2
**screening** 29:10
**screwed** 82:13
**screws** 35:16 35:17 36:5
**scroll** 53:2 54:6
**se** 45:17
**sec** 37:5
**second** 26:2 37:18,20 53:2 54:4 69:4 84:2 85:13 87:1,3
**secondary** 9:6
**secretary** 66:12
**section** 5:4
**secure** 26:7 32:23,24,24
**secured** 24:15 32:2,19,20 44:14 73:17
**security** 11:5,5 11:6,7,11,15 17:17,17 21:5 21:7 24:9,10 28:11,18 29:2 30:4 73:19,21 80:7 86:14
**see** 15:2 25:15 25:15 29:15 37:6,7,12 42:9 45:8,22 52:22 52:23 53:12 54:2 55:23 57:14 69:25 80:22 82:6
**seem** 3:14
**seemed** 35:11 69:18,19
**seems** 53:7,8
**seen** 25:16 57:24 77:25
**sell** 15:21,22
**semester** 9:11
**send** 42:22 53:17
**sending** 87:18
**senior** 8:18
**sense** 18:24 19:25 33:9 44:15 54:25 60:17 71:16,20 78:3
**sent** 45:18 46:12,13 47:3 47:11 50:3 54:14 56:21 59:11 61:19,20 93:14
**separate** 92:8
**separation** 77:18 78:1
**september** 56:4 56:18
**serious** 64:1 81:22
**services** 89:15
**set** 7:10 22:19 23:25 24:3 25:7,21 26:16 27:1,18 47:20 57:8,25 65:16 73:15,23,24 80:16
**setting** 46:23
**severed** 82:16
**shadow** 33:19 33:23 34:3,3
**share** 36:19 37:5 45:6 52:15,22 54:1 55:21
**sharing** 52:13 55:11

**sheet** 34:10 92:8 93:11
**sheriff** 77:15 80:20
**sheriff's** 24:11 76:22
**shift** 14:5 18:9 19:10,20,21 28:17 29:8,17 29:19,19,24 75:4
**shifts** 19:9
**shit** 46:14
**shoot** 9:22
**shop** 34:13
**shopping** 16:15
**shorter** 58:15
**shortly** 22:18 46:16 72:2,3,8 74:14
**show** 18:2 36:22 44:22 57:8 73:12
**showed** 42:5
**shower** 16:15
**showing** 74:15
**shutting** 74:9
**sic** 3:14 36:10 59:7
**side** 15:6 16:5,7 16:8,10,18 24:20,21 27:20 50:17 73:16 81:17
**sideswiped** 81:24
**sign** 33:16,25 34:5,10,19 93:12
**signature** 37:23 37:24 88:3 89:20 90:22
**signed** 15:9 34:20 80:1 93:19
**signing** 33:14 34:4
**simple** 17:18
**simply** 80:4
**sink** 18:16,17
**sit** 20:22 32:17 68:20 82:22
**site** 21:8 35:6 76:23 77:11,12 77:13 78:13 80:18,19
**situation** 36:7 36:24 39:20 75:2
**six** 8:6 9:25 10:4 51:21 85:14
**sketchy** 85:15
**skill** 68:1
**skills** 16:23 84:19
**slap** 31:10
**slight** 67:11
**slow** 55:23 70:15,22 71:9 71:9,10 85:10
**small** 35:22 36:5 39:10 83:4,11
**smith** 2:6
**smoother** 66:19
**snake** 33:21,22
**social** 86:13
**solutions** 89:12 89:14 93:23
**solved** 66:16
**somebody** 32:16
**somewhat** 20:21
**soon** 41:22
**sophomore** 8:16,17
**sorry** 19:4 23:19 28:9 30:22 32:11 41:9 51:4,6 54:1 62:1 69:7 73:8 80:23
**sotto** 37:16
**sound** 36:15 72:10
**south** 9:4
**southeast** 93:15
**speak** 72:19
**speaking** 47:14
**spelled** 3:17
**spend** 18:25 32:5
**spent** 41:18
**spoke** 45:23 61:16,17
**sprinkler** 79:8
**staff** 25:13 28:25 77:6
**stand** 68:21
**standby** 24:5 25:3,9
**start** 7:22 8:8 9:16 14:16 48:23 64:9
**started** 10:9 17:11 22:14 23:2 72:1 73:10
**state** 5:12 89:3 90:3,7
**stated** 26:18 40:25 43:4 44:18
**statement** 3:9
**states** 1:1 8:4,9
**status** 20:14
**stay** 20:25 42:9
**stayed** 74:19,20
**staying** 23:10
**step** 22:5
**stepladder** 86:12

**stipulations** 1:17
**stop** 52:13 55:11
**stopped** 64:10 78:21
**stopping** 66:5
**storage** 74:4
**stories** 30:16
**straight** 25:5 73:19,19,21
**strange** 3:15
**strattera** 43:12
**street** 2:7
**strength** 65:9 84:15
**strengths** 43:15
**stress** 74:11
**strike** 33:11
**struggles** 50:14 50:16 51:1
**stuck** 38:19
**studies** 12:10
**study** 9:9
**stuff** 7:15 13:3 14:8 15:5 18:20 39:2 48:17 70:25 72:8 73:11,12 83:3,4,25
**stupid** 20:24 44:16
**submitted** 61:20,21
**suck** 13:21,21 14:20,21,21
**sudden** 85:14
**suddenly** 49:15 79:20,21
**suite** 2:8
**summer** 8:12
**sunlight** 80:21
**supervisor** 23:10 41:19 82:24
**supply** 18:17
**support** 17:15 60:22 82:24,25 83:2
**supporter** 61:18
**supposed** 33:3 84:9
**supposedly** 31:23 35:19 75:16 80:18 82:23
**sure** 6:24 20:23 20:24,25 21:5 21:6 23:7 27:18 37:25 40:15 41:11 47:7 52:15 55:13 66:15,15 68:6
**suspended** 75:22,23,24 76:1
**suwannee** 9:1
**swallow** 12:10
**swapping** 18:16 64:13
**sworn** 5:5,9 40:22
**system** 10:1,10 10:13,16,20 23:21 24:4 25:9 64:2,16 79:19,20 87:9
**systems** 65:16

**t**

**t** 3:7,7,7,11,11 4:1 81:24 90:1 90:1 91:1,1
**table** 82:16
**tag** 51:25 52:1
**take** 7:7 16:15 18:14 22:17 23:5 25:24,24 26:17 28:25 33:6 39:5 43:17,24 44:12 44:13,16 45:12 54:4,23 61:8 69:7 71:18 72:12 79:24 85:20 86:12,15 87:12
**taken** 1:17 6:23 35:22 62:14 66:23 81:10 90:10
**takes** 28:12 86:20
**talk** 21:22 23:9 30:25 42:8 48:12,16 56:20 59:7 61:12 76:19 77:22,24
**talked** 46:8 62:17 68:21
**talking** 34:12 36:21 40:24 46:5 48:10 58:12
**target** 67:6
**taught** 64:7
**taylor** 1:20 89:10,21 90:6 90:23
**teach** 27:7 65:19 73:11
**team** 41:17 51:17,18,25 52:1 59:22 62:19,19 69:21 69:22 70:4,6 82:24
**teamed** 51:16 51:17
**teams** 13:1
**tech** 9:8
**technical** 19:3 32:6 44:1 68:25

**technically** 12:1
**technician** 19:11,14 58:6
**teeth** 26:3
**tell** 11:20 12:17 14:20 16:25 17:9 21:22 26:14 29:12,13 35:2 36:18 42:7 47:7 48:1 53:14 56:19 61:1 63:16 68:6,6,10,13,16 69:9 73:1,3 74:25 75:5,6 84:10,12
**telling** 18:25 62:11,12,22 66:8 85:14 86:1
**tells** 64:11,16
**temporary** 78:8
**ten** 11:4
**terminated** 76:15 81:15
**test** 12:10 50:9
**tested** 46:11,18 85:9
**testified** 5:9
**testimony** 90:10,14 92:5 93:9,17
**testing** 47:24 48:1
**text** 45:1 46:9 46:13
**texted** 42:24
**texting** 60:1
**thank** 41:22 47:13 53:17 87:16
**thing** 6:1 14:4 34:18 36:21 42:24 43:11 44:13 48:15,15 48:19,25 55:6 57:7 63:19,24 64:14 65:8 67:9 70:4,21 79:5 83:12,13 84:23 85:11 87:1
**things** 18:6,24 33:6 42:1 51:19 63:23 71:13 74:12 78:12 81:21 86:13
**think** 5:16,18 8:5,16 9:11,14 10:7 11:2 12:6 12:16 13:9,13 14:1,15,19 15:5,7,8,10,11 16:1,1 19:16 30:21,22 31:25 32:5,17 35:19 39:15,15 41:6 43:12,13 44:7 44:7,9,11 46:7 46:10,10,12 48:8 49:8 54:5 55:3,8 58:23 58:23 59:2,23 59:24 60:10 65:9 69:11,15 70:16 71:3,9 75:25 78:7,12 79:11,12 85:6
**thinks** 35:25,25
**third** 60:24 87:3
**thought** 3:12 3:13 35:25 37:12 40:21 41:2 62:1 64:17 79:12
**three** 10:2,17 10:17 11:12,22 12:18 13:19 28:21 31:13,14 40:9 66:2,2 84:9 85:21,21 85:21 86:15,20 87:13
**thriving** 63:22
**throw** 11:9
**thumbprint** 27:12,21
**ticket** 20:14 52:3 64:10 71:10,12
**tickets** 17:18,25 18:1,3,14 20:13 48:17 52:2 58:18 59:17,21 64:9 65:6 66:15,21 71:20 72:7 79:2
**tie** 20:7,8
**tiers** 64:25 65:1
**tile** 71:18
**tiles** 17:20
**till** 29:21 74:20
**time** 7:10,24 23:4,5 26:12 31:16,17,21,23 31:25 32:13,20 33:8,24 34:4,4 35:2,2 36:12 40:25 41:3 42:11 43:5,6 48:11 49:6 50:5,23 51:10 53:9 57:5 58:9 58:12,18,19,21 60:24 70:8 71:11 74:8,24 75:22,25 76:16 78:3,9 82:16 84:1,2 87:3,12 87:17 93:18

**timeframe** 93:8
**timeline** 74:12
**timely** 71:11,12
**times** 22:4 25:18,22,23 27:23 28:20,21 29:6 30:13 31:13,14,16 33:20 39:8 43:15 62:18 66:14 67:11 77:21 83:1
**today** 42:19
**together** 51:19 52:2 61:21
**toilet** 65:16
**toilets** 18:18
**told** 21:11 27:4 27:7 30:14,14 30:15,15 31:4 39:14,14,15,15 41:24 42:5,6 42:21 44:15 46:12 58:24 60:13,14 61:22 62:18 63:17 65:2,13 68:20 75:24 76:14,16 80:18 85:10
**tom** 15:8,10
**tomorrow** 48:18
**tons** 38:22
**took** 11:3,16,22 12:12 13:8 16:12,13 34:11 34:12,15,19,20 35:5 43:7 49:14 54:18 55:2,3,8 63:21 66:19 68:20 78:8 85:2
**tool** 34:14,19 34:20,23,25
**toolbox** 32:4,15 32:20,24 34:17 38:19
**toolboxes** 33:18 35:10,13
**tools** 23:6 33:13,18,18,22 33:24 35:13 36:4 39:23
**top** 38:5 53:11 62:20 65:4 69:8
**totally** 28:2,3
**totem** 20:7 22:21
**touched** 68:17
**town** 8:24
**track** 28:15
**tracking** 39:23
**trade** 9:7,9,13 9:16 17:6 59:21
**trades** 17:16 58:6
**trainer** 79:3
**training** 27:5 36:11 41:18 58:20 59:19,19 66:4 72:5
**transcribe** 6:6
**transcribed** 6:2 6:11
**transcript** 87:22,23 90:9 92:4,9 93:6,19
**transferred** 12:9 44:8
**transport** 82:25
**transported** 12:12
**transporter** 11:19 12:5,7 12:14
**trashed** 13:4
**tried** 43:14 83:16 86:6
**trouble** 30:19 31:3
**troubleshooti...** 18:20
**true** 75:8 90:9 90:14 92:4
**trust** 82:3
**truthful** 7:1
**try** 30:1,5 37:8 51:18 65:1,21
**trying** 42:8,14 47:20,25 59:24 70:22 72:15 73:5,9 86:16
**tuesday** 1:19 76:12 89:4
**turn** 28:22 30:17 54:10 63:18 67:19 69:20 81:24
**turned** 54:11
**twice** 43:17
**two** 9:15 25:25 27:13,14,14,16 34:3 41:18 53:1,5 54:5 72:12 85:11 86:13
**type** 9:5 16:9 22:11
**typically** 19:9

**u**

**u** 89:1
**uber** 81:21 82:2
**ugly** 30:15
**unable** 66:16 85:24
**under** 6:23 69:15,15 74:11 74:11 89:17

**understand** 6:5 6:12,19,25 7:14 42:23 46:1 49:23 52:12 65:7 68:2 70:22 72:15 74:14,24 75:16 77:16 86:16 87:10,15
**understanding** 42:24 80:2
**understood** 3:18 6:22
**unemployment** 83:19,22
**unfortunately** 32:11 47:1
**unit** 40:3
**united** 1:1
**units** 73:12
**unsold** 15:23
**update** 40:7,8 47:8
**updated** 40:9
**updating** 20:13
**upload** 77:4
**upper** 64:25
**upset** 63:16 68:13,16 69:19
**use** 24:2 28:16 33:13,23 34:13 35:14 78:8 79:7 82:22
**used** 40:8 65:16 66:21 93:19
**using** 52:7 78:6 80:6
**usually** 15:20 21:19 23:20 59:18 87:3

**v**

**v** 1:9 90:11 91:6 93:4
**valve** 64:4,4
**vehicle** 81:25 82:25
**verbal** 6:8
**verbatim** 3:16
**verify** 93:9
**veritext** 89:12 89:14 93:14,23
**veritext.co** 93:15
**vice** 34:14
**videoconfere...** 1:23
**voce** 37:16
**volume** 63:6

**w**

**wait** 6:14
**waited** 26:12
**waiting** 6:16
**waitlist** 86:17
**walk** 23:5
**walked** 31:8,9 64:23 76:5 77:8
**wall** 17:19 34:4
**walls** 17:23
**wander** 20:24
**want** 6:24 15:24 21:23 26:15 27:6,21 29:9,14 40:21 41:5,11 43:18 44:12 51:6 52:14 55:13 67:20 68:19 69:24 74:3,11 76:23 77:11,12 77:13 80:17,19 82:23 87:21,23
**wanted** 26:15 39:18 40:14 60:10 63:4 65:14 69:21 80:10 83:16
**wants** 62:19,19 62:20,21 82:20
**washers** 38:24
**watch** 20:22 21:17,23 22:12
**water** 17:21 18:16 74:9
**way** 23:24 30:5 30:16 31:18,18 33:7 73:20 74:2 75:14 77:3,25 78:6 79:19 82:17 87:9 90:19
**ways** 27:14,16 29:5
**we've** 72:6 87:2
**weakness** 50:10 84:13
**wears** 64:6
**week** 84:9
**weekend** 74:18 81:2,3
**weekends** 81:7
**weeks** 31:24 63:3 84:6
**weird** 42:20 85:6
**went** 16:24,25 17:5 26:23,23 26:23 27:17 31:17 32:15 34:15 38:17,25 40:1 41:22 44:2 46:7 48:24 50:6 60:4,5 67:21 68:14,18 73:21 73:25 78:13 80:4,11 84:22 84:23
**wheels** 33:19
**willing** 22:5 71:7
**window** 13:6 25:16 26:5,8 26:24 27:6

**wire** 79:5
**wished** 77:7
**witness** 5:5,8 37:16 88:4 93:8,10,12,18
**woodworking** 16:25 17:5
**word** 3:14 35:3 35:3 63:20
**work** 9:21 10:15,24 11:5 11:11,15 12:13 12:14,14 13:18 14:10,14 15:13 16:9 18:5 19:9 19:22 20:18 22:11 23:8,21 29:14,18 43:18 43:18 56:22 59:18 61:18 70:9 74:16 76:12 77:24 78:21 81:6,14 81:21 82:3,15 82:21 83:15,18 85:24,25 86:18
**worked** 9:18 10:1,3 11:4,19 12:16,16 13:24 14:1,15 15:10 19:10,20 21:2 21:2 49:12
**worker** 85:11
**workers** 18:4
**working** 7:24 9:17 10:5,10 12:4 14:16,25 19:12,21 20:22 34:13 36:10 42:10,15 47:23 48:7 49:6 50:18,24 51:11 60:20 81:12 82:14
**works** 86:19
**worry** 76:3
**worse** 60:14
**worsened** 81:19
**wow** 46:13
**wrench** 79:7
**write** 36:22 40:5
**writing** 38:3
**written** 3:16 72:3,4 79:17
**wrong** 80:12 83:12 84:5

**x**

**x** 3:1 4:1,1

**y**

**yard** 16:19
**yeah** 8:15,23 9:9 10:21 12:6 12:6,24 13:16 14:23 15:15 16:7,7 17:3 18:7,7,7,8,8,8,8 19:7,18 21:11 22:14 24:11,11 24:19,19 26:7 28:7,16 29:23 30:1,1,2,2,12 30:12,12 32:1 33:15,17 37:11 37:14,19,22 38:2,2,4,9 39:12 40:16,16 41:2,12,12 43:10,22 45:9 45:14,14 46:6 46:6,6,19,22 47:10 51:9,14 53:6,19 54:15 54:17 55:16,24 56:5,9,9,14 57:9,19,24 58:2 59:2,14 60:18 62:6,11 69:17 71:21,21 72:12,16,16,23 72:23 75:15,23 76:9 79:10 80:9,10 81:5,6 86:25 87:13,13 87:13
**year** 9:15 10:4 14:11,19 81:23 83:24 86:23 87:13
**years** 7:16 8:6 9:15 10:2,17 10:17 11:4,12 11:23 12:18 13:9,9,19,20 49:10,13 85:21 85:21,21 86:15 86:20

**z**

**zoom** 5:23

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by paragraph (1) of subsection (f) of this Code section whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed. If the deposition is not reviewed and signed by the witness within 30 days of its submission to him or her, the officer shall sign it and state on the record that the deposition was not reviewed and signed by the deponent within 30 days. The deposition may then be used as fully as though signed unless, on a motion to suppress under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.